HOLLY MANUF'G Co. *et al. v.* NEW CHESTER WATER Co. *et al.*[1]

(*Circuit Court, E. D. Pennsylvania.* September 19, 1891.)

1. CONTRACTS—RIGHTS OF THIRD PERSONS.

The New Chester Water Company made a contract with B. & Co., water-works contractors, to build its works, agreeing to pay them with its stocks and bonds. These stocks and bonds were, as earned, pledged to W. G. H. & Co., to secure advances. After all the advances had been made, said B. & Co. and W. G. H. & Co. and R. D. W. & Co. made a tripartite agreement, which recited that the stock and bonds pledged to W. G. H. & Co. had been sold to R. D. W. & Co., and that B. & Co. represented that the New Chester water-works and three others could be completed for $200,000, and by which W. H. G. & Co. agreed to advance that sum to B. & Co., to be applied by R. D. W. & Co., who guarantied the completion of the works of the four undertakings clear of all liens ahead of securities held by W. G. H. & Co., specifying certain proportions of the $200,000 to be applied to each work. A less proportion of the money than that specified was employed at the New Chester Company's works, but the whole amount, and $105,000 additional, was expended on the four works. B. & Co. purchased engines for the New Chester water-works from complainants, but only partly paid for them. *Held* that, complainants not being parties to the tripartite agreement, and being strangers to the consideration therein, R. D. W. & Co. were not personally liable for the price of the engines on account of said agreement.

2. CORPORATIONS—STOCKHOLDERS—LIABILITY FOR UNPAID ASSESSMENTS.

Where stock of a corporation has been transferred for labor done, and the good faith of the transaction is not impeached, nor a failure of consideration shown, the holder is not liable personally on the grounds that said stock is unpaid capital stock, and that the unpaid assessments are a trust fund for the payment of the corporation indebtedness.

3. FIXTURES—PUMPING-ENGINES.

B. & Co., a firm engaged in fitting up water-works, ordered from an engine building company two pumping-engines, to be set up in the works of a water company they were fitting up at Chester, agreeing to pay for them in installments, and that the engine building company should "have a lien on" the "engines and connections," and "should remain in full possession thereof." The engines were erected on land of which B. & Co. then held the legal title, in such a way that they could readily be taken down and removed; and remained under the control of the engine building company's agents, to whom the engines had been consigned at Chester. *Held,* the engines did not become realty, and a valid lien in favor of the vendors existed against B. & Co. and the water companies.

4. CORPORATIONS—NOTICE TO OFFICERS OF LIEN.

The New Chester Water Company transferred all its shares of stock either directly to B. & Co. or to B. & Co.'s employes, and put itself in the "absolute control" of B. & Co., its officers being B. & Co.'s servants. B. & Co. purchased machinery, making it subject to a lien, and placing it in the works of said water company. Some of the directors of the company had actual notice of the lien. *Held,* the company had notice of the lien.

5. SALE—VENDOR'S LIEN—NOTICE.

The retention of open control by a vendor's employe over machinery placed in the works of a company which were being fitted up by the vendee, is notice to said company of the existence of a vendor's lien.

6. SAME—MECHANIC'S LIEN.

The fact that the land and buildings of a water company are not subject to lien under the mechanic's lien laws of Pennsylvania does not prevent a movable piece of machinery, delivered conditionally to such a company, from being subject to a valid contractual lien. *Foster v. Fowler,* 60 Pa. St. 27, discussed.

7. JURISDICTION OF CIRCUIT COURTS—CITIZENSHIP OF PARTIES.

The parties giving a contractual lien on machinery, who, in purchasing the machinery, had acted solely as the agents of the respondents in the suit, and had conveyed away all title to the property, were, subsequently to the filing of the bill, made parties plaintiff by amendment, not for purposes of relief, but to bring all parties before the court. Said parties were citizens of the same state as were the original complainants. *Held,* upon the objection that said parties should have been joined as parties respondent, and, when thus joined, the court had no juris-

[1] Reported by Mark Wilks Collet, Esq., of the Philadelphia bar.

diction, that they, being in the position of mortgagors who had parted with all interest in the property, were merely formal parties, and their joinder did not affect the jurisdiction.

8. TRUSTS—ACTIONS RELATING TO TRUST PROPERTY.
The trustee of a corporation mortgage need not be joined as a party defendant in a suit to enforce a specific lien which does not involve the validity of the trust mortgage, or affect its lien, when all the bondholders are before the court, and the joinder would oust the jurisdiction.

9. EQUITY—ENFORCEMENT OF VENDOR'S LIEN.
A bill in equity is the proper means to enforce a contractual vendor's lien on machinery to secure unpaid purchase money.

In Equity. Bill by the Holly Manufacturing Company, a corporation organized under the laws of the state of New York, and having its principal place of business in the city of Lockport in county of Niagara, and a citizen of the state of New York, against the New Chester Water Company; the South Chester Water Company; W. G. Hopper and Harry S. Hopper, trading as W. G. Hopper & Sons; William Bucknell; Richard Wood, George Wood, Walter Wood, and Stuart Wood, trading as R. D. Wood & Co.; the Bienville Water Supply Company, (afterwards, James H. Little, Craig Lippincott, and Harry S. Hopper, trustees, and William Hopper being made parties defendant, and Samuel R. Bullock and J. S. Bullock, trading as S. R. Bullock & Co., being joined as complainants.) Decree for complainants.

*Rowland Evans, Richard L. Ashhurst,* and *L. F. & G. W. Bowen,* for complainants.

*William C. Hannis,* for respondents W. G. Hopper & Sons.

*W. Ward,* for respondents New Chester Water Company and South Chester Water Company.

*Richard C. Dale,* for intervener, Thomas A. Parott.

ACHESON, J. The proofs in this case are unusually voluminous, and the transactions thereby disclosed are many and complicated. Some matters which we regard as immaterial to the real issues we will not discuss or mention. The controlling facts we find to be as follows:

In the year 1885 charters of incorporation were obtained for four water companies, namely, the New Chester Water Company, the South Chester Water Company, the Penn Water Company, and the Upland Water Company, formed for the purpose of furnishing water for public and domestic use to the city of Chester and adjacent boroughs, in Delaware county, Pa. On December 9, 1886, before any work was done by them, a written agreement was entered into between the four companies in their corporate capacity, all the stockholders thereof individually, and Samuel R. Bullock & Co., a firm of water-works contractors. The leading purpose of the parties to this agreement is expressed in the following clause of the preamble:

"And whereas, the stockholders are desirous of selling their said shares of capital stock, and of transferring and surrendering the absolute control of the water companies, and the vendees (Bullock & Co.) are desirous of purchasing and acquiring the same."

Accordingly the stockholders thereby agreed to transfer all the stock of said companies to Samuel R. Bullock & Co., and to deliver to them

"all the charters, certificates of organization, books, papers, deeds, maps, plans, estimates, stock-certificate books, transfer books, minute books, receipts, accounts, contracts, the corporate seals, and all other property of any and every description, kind, or nature belonging to the water companies, or any of them;" and, in consideration thereof Bullock & Co. agreed to enter into a contract with the water companies, on terms to be arranged, for the construction and equipment of a system of water-works for furnishing water to the places which the companies were authorized to supply. The stockholders having complied with their part of this agreement, the following transactions took place and contracts were entered into, all on March 21, 1887: Resolutions were adopted by the stockholders of the Penn Water Company and Upland Water Company to sell and convey the franchises and property of those companies to the South Chester Water Company, and such written transfers were executed. Resolutions were adopted by the stockholders of the South Chester Water Company to increase its capital stock from $1,000 to $600,000, and to issue its bonds for $300,000, to be secured by a mortgage upon its franchises and property. Resolutions were adopted by the stockholders of the New Chester Water Company to increase its capital stock from $500,000 to $1,000,000; to issue its bonds for $500,000, to be secured by a mortgage upon its franchises and property; and that the company guaranty the said bonds of the South Chester Water Company. The New Chester Water Company and the South Chester Water Company entered into an agreement, which, *inter alia*, provided that the former company, by its machinery, and from its reservoirs, would supply water through the pipes of the latter company to its territory. And finally a contract in writing was entered into between Samuel R. Bullock & Co. and the New Chester Water Company, whereby the former agreed to provide the necessary land for an engine and boiler house and a reservoir site, and to furnish all material and labor for and to construct and equip water-works at Chester, to be accepted by the water company after completion and satisfactory inspection and test, for the consideration to the contractors of $500,000 in the mortgage bonds of the water company and 17,000 shares of its capital stock of the par value of $50 each. At that date, March 21, 1887, the stockholders of the New Chester Water Company and the number of their respective shares were as follows: Samuel R. Bullock & Co., 9,995 shares; J. L. Forwood, 1 share; W. H. Miller, 1 share; E. F. Fuller, 1 share; Ellis Morrison, 1 share; Charles M. Berrian, 1 share. Each of the last-named five persons then held one share of stock in each of the other-named water companies, Bullock & Co. holding the rest of the stock thereof. The proofs fully warrant the conclusion that these holdings of stock by Forwood, Miller, Fuller, Morrison, and Berrian were nominal and formal, merely to give a legal *status* to the organization. These five persons constituted the board of directors of the New Chester Water Company, Forwood being president, and Miller secretary. Fuller was chief engineer of the company, and an employe of Bullock & Co. Berrian was the attorney of the company, and private counsel of Mr. Bullock. All these five directors were com-

v.48F.no.11—56

pletely under the control and direction of Samuel R. Bullock & Co. Emil Woltman, the treasurer of the company, was the confidential clerk of that firm.

Samuel R. Bullock has here testified:

"An arrangement was perfected whereby the *personnel* of the New Chester Water Company was subordinated to the management, direction, and control of my firm, based upon the idea that we would carry out the objects for which that company was incorporated."

This statement is true. At the dates of the several transactions to which reference is about to be made, and from March 21, 1887, continuously down until November, 1888, Samuel R. Bullock & Co. had "the absolute control" of the New Chester Water Company, and the organization of that company was wholly under the management and practically in the hands of that firm. The directors acquiesced in whatever that firm did, and practically were but its agents. On April 1, 1887, the New Chester Water Company executed a mortgage of its franchises and property then owned or thereafter to be acquired to the Farmers' Loan & Trust Company, a corporation of the state of New York, to secure payment of $500,000 of its bonds, payable to Samuel R. Bullock & Co., or bearer; and the South Chester Water Company executed a like mortgage to the same trustee to secure like bonds to the amount of $300,000. On May 31, 1887, an agreement in writing was entered into between the South Ward Water-Works, a corporation, the city of Chester, and the New Chester Water Company, whereby, for a consideration mentioned, and moving from the last-named company, the first-named corporation agreed to sell, transfer, and convey all its property, real and personal, to the New Chester Water Company. On June 13, 1887, a contract in writing was made between William G. Hopper & Co. and Samuel R. Bullock & Co., whereby, for a specified consideration, the former agreed to furnish to the latter advances of money upon the bonds of the New Chester Water Company, as earned by and delivered to Bullock & Co., and the notes of that firm, with a deposit as further collateral security of all the stock of the New Chester Water Company and the property of the South Ward Water-Works. On July 7, 1887, Hopper & Co. made a special advance of about $300,-000 to Bullock & Co. to enable them to consummate the purchase of the South Ward Water-Works, and as security therefor Bullock & Co. delivered to Hopper & Co. the above-mentioned $300,000 of bonds of the South Chester Water Company. In pursuance of written authority signed "J. L. Forwood, President," and "W. H. Miller, Secretary," the real estate of the South Ward Water-Works, by the deed of that corporation dated and executed July 7, 1887, was conveyed to Samuel R. Bullock in fee. On July 12, 1887, Samuel R. Bullock, by deed of that date, conveyed the said real estate to H. S. Hopper, who, on July 29, 1887, executed and gave to Bullock an instrument in writing setting forth that the conveyance to him was made as security for advances made and to be made by Hopper & Co. to Bullock & Co. All the advances which Hopper & Co. ever made under their contract of June 13,

1887, were made prior to September, 1887. On August 3; 1887, Samuel R. Bullock & Co. and the Holly Manufacturing Company, a corporation of the state of New York, entered into a written contract, whereby the latter agreed to manufacture two pumping-engines of specified capacity, and set up the same at the city of Chester for the sum of $50,000, payable $8,333.33 on each engine when delivered in Chester, and the like sum on each engine when it has been properly run 30 days, and the like sum on each engine 30 days thereafter. The contract contains the following clause:

"When said engines and connections are completed and ready for service, and on notice thereof to the party of the first part (Bullock & Co.) to that effect, the same shall be subjected to a fair trial of their capacity and efficiency for not exceeding twenty-four hours, and, on the successful testing thereof, the liability of the party of the second part (Holly Company) hereunder shall cease and determine; but it is expressly understood and agreed that the party of the second part shall have a lien on all of said engines and connections, and the party of the second part may remain in and have full possession thereof, until the whole amount of the purchase price of said engines and connections shall have been fully paid to the party of the second part or its assigns."

One payment only, namely, the sum of $8,333.33, was made to the Holly Company under its contract, and at the date of the bringing of this suit the balance, or sum of $41,667, was due that company on said engines. On October 26, 1887, a tripartite agreement was entered into between Samuel R. Bullock & Co., R. D. Wood & Co., and William G. Hopper & Co., whereby, after reciting contracts between Bullock & Co. and Hopper & Co. for advances by the latter to the former upon a pledge of bonds and stocks of water companies, an assignment by Bullock & Co. to Wood & Co. of the bonds and stock so pledged as collateral security for materials they had furnished, and contracts between Bullock & Co. and Wood & Co., by which the latter had undertaken to complete water-works at Chester, Greencastle, and Mobile, and the representation by Bullock & Co. that $200,000 would enable them to complete those works, William G. Hopper & Co. agreed to advance to Bullock & Co. $200,000, the same to be applied by Wood & Co. to the completion of the water-works at the three named places in certain specified proportions; Wood & Co. to present to Hopper & Co. the detailed applications by Bullock & Co. for money as needed, and Hopper & Co. thereupon to furnish such amounts (within the limit stated) to Wood & Co., who should give their checks for the same to Bullock & Co., who should disburse the moneys for the purposes aforesaid; and, in consideration of this advance by Hopper & Co., Wood & Co. agreed to procure the completion of the water-works at the three named places "clear of all liens ahead of the securities held by William G. Hopper & Co." Under this agreement Hopper & Co. advanced the $200,000, which was all applied to the water-works at the three named places, but not in the proportions mentioned in the contract. The specified amount applicable to the works at Chester was $129,800, whereas the sum actually applied was $61,000 only. But the representation by Bullock & Co. that $200,-

000 would suffice to complete the works at the three places proved to be incorrect, for, besides the money so advanced by Hopper & Co., Wood & Co., in the completion of those works, used $105,000 of their own money, and even then the balance of $41,667 due the Holly Company on the pumping-engines at Chester was left unpaid, and also $25,000 due that company on engines at Mobile; and it would seem some other debts remained unsettled. All the advances by Hopper & Co. under the tripartite agreement were made before the latter part of January, 1888, except a trifling sum, which was paid shortly afterwards.

In October, 1887, the Holly Company shipped one of the pumping-engines to Chester, and in February, 1888, the other. Each was consigned to that company itself, and its agents at Chester received the engines, and proceeded, at its expense, to put them in place. They were set on the top of masonry foundations, and were attached thereto by a number of two-inch iron bolts. They could not be operated or tested otherwise. The engines stand in a brick building erected on land which the South Ward Water-Works Company agreed to sell and convey to the New Chester Water Company, but actually conveyed to Samuel R. Bullock, who conveyed the same to H. S. Hopper for the purpose set forth in the paper executed by the latter, as already mentioned. Each engine weighs from about 70 to 80 tons; but they can easily be disconnected from the foundations on which they rest without disturbing the foundations, and can readily be taken apart and through the door of the engine-house without injury to the building.

When the first engine was shipped to Chester, John Lockman, by order of the Holly Company, and as its agent, went there to superintend the erection of the engines and to take charge and control thereof. This he did, remaining constantly in charge. The work of setting them up ready for service was not completed until some time in July, 1888, but for the delay the Holly Company was not responsible. From the time the first engine was got in working order Lockman acted as engineer, and he has maintained the exclusive charge and custody of both engines. He has carried a key of the building. His wages have all been paid by the Holly Company, and he has acted throughout as its agent. No formal test of the pumping capacity of the engines, as provided by the contract, was ever made, nor was there any formal acceptance of them by any one. When ready, they were set to work pumping water into the reservoir, and have continued to do so und r Lockman's control. It is shown that explicit instruction was given by the Holly Company to Lockman to hold possession of the engines for that company, but the exact date thereof does not appear. Lockman states it was given about midsummer, 1888. Samuel R. Bullock, referring to conversations he had with the officers or representatives of the Holly Company, testified thus: "They told me that they proposed to have Lockman remain there as their representative in charge of the pumps, but they didn't want to interfere with the operations of the company, so he could act as engineer, and run the pumps right along;" and Mr. Bullock further testified that he consented to Lockman remain-

ing in possession and charge, as desired by the Holly Company. This testimony of Mr. Bullock is uncontradicted, and there is no reason to doubt its truthfulness. The bill in this case was filed September 19, 1888, while Lockman was still in control of the pumping-engines, and he has since maintained his charge and custody thereof in the manner stated, as the representative and under the pay of the Holly Company. In November, 1888, Bullock & Co. assigned their entire remaining interest in the bonds and stock of the New Chester Water Company to Wood & Co., and at the same time delivered to them resignations of the officers of the water company. Thereupon new officers were elected, and the water company then took the actual possession of the works, but Lockman's control of the engines continued. Hopper & Co. and Wood & Co. together hold substantially the entire mortgage bond issue of $500,000 of the New Chester Water Company. Sixteen bonds of $1,000 each are, indeed, held by Dyer and Black under a pledge made in July, 1887, but only to indemnify them against a claim which the water company itself may have against them as sureties for Bullock & Co., touching a lien of $15,000 which they were to remove. All the bonds and stock of the New Chester Water Company which Bullock & Co. were to receive under their construction contract had been delivered to them probably before the first pumping-engine reached Chester, and certainly before its erection began. On March 31, 1890, Samuel R. Bullock and wife executed and delivered to the New Chester Water Company a deed of conveyance of the land upon which the engine-house and pumping-engines stand.

Upon this state of facts two questions are presented for our determination: *First*, whether R. D. Wood & Co. are under any personal liability to the Holly Manufacturing Company; and, *second*, whether that company has a valid lien upon or claim to the pumping-engines at Chester enforceable in this suit.

The first question, it seems to us, is not difficult of solution. The Holly Company was not a party to the tripartite agreement of October 26, 1887. That instrument contains no provision expressed to be in its behalf. Neither was any money thereby specifically set apart to pay for pumping-engines either at Chester or Mobile. The agreement was for the mutual benefit of the three parties who executed it, and to promote a purpose in which they had a common interest. To secure the faithful application to that object of the fund which Hopper & Co. proposed then to advance it was stipulated that it should pass through the hands of Wood & Co., but the paper provided that ultimately the money should be distributed by Bullock & Co. It was then believed that $200,000 would complete the water-works at Chester, Greencastle, and Mobile. So Bullock & Co. had represented. Confiding in the correctness of that estimate, the paper provided for the apportionment of the fund between the three places. But this did not give third persons any right to control the application of the fund, or any vested interest therein. The parties to the agreement did not relinquish their joint dominion over the fund. As between themselves, the agreed apportion-

ment in the first instance was binding, but it was not irrevocable by them. Therefore when they discovered that the fund was insufficient to accomplish all that was intended it was competent for them to change the apportionment. This was done by their mutual consent, and no third person had any right to complain. In point of fact, every dollar of the money so advanced by Hopper & Co. was used in the completion of the water-works at the three places, although not in the proportions originally contemplated.

We note the recital in the tripartite agreement that "Samuel R. Bullock & Co. and R. D. Wood & Co. have entered into certain contracts by which the said R. D. Wood & Co. have agreed to complete the water-works at Chester, Greencastle, and Mobile." But those contracts are not in evidence. We do not know their contents, and they are not here available to the Holly Company. The stipulation that Wood & Co. would procure the completion of the water-works "clear of all liens ahead of the securities held by Wm. G. Hopper & Co.," was for the special benefit of that firm, and the Holly Company is a stranger to the consideration upon which it was based. Moreover, Wood & Co. have made advances out of their own pockets to the amount of $105,000 not contemplated by the parties. Notwithstanding this unexpected result, they may still be legally answerable to Hopper & Co., but we do not perceive that the Holly Company has any right to equitable relief by virtue of anything contained in the tripartite agreement. Nor does the fact that Bullock & Co. assigned all their remaining interest in the bonds and stock of the New Chester Water Company to Wood & Co. affect the case. The good faith of that transfer is not impeached. Neither, under the proofs, can it be maintained that the stock of the water company in the hands of Wood & Co. is unpaid capital stock, and hence a trust fund for the payment of the debts incurred on behalf of the company. We are, then, of the opinion that no equitable ground to charge R. D. Wood & Co. personally is shown.

We pass now to a consideration of the rights of the Holly Manufacturing Company under the clause already quoted of the contract of August 3, 1887. The language there used is plain, and the purpose unmistakable. The contract not only created a lien upon the engines for the purchase price, but it also provided that the Holly Company "may remain in and have full possession" thereof until the price is paid. The privilege thus conferred upon the Holly Company to maintain possession evidently was for the better security of the purchase-money. This right, it is to be assumed, was to be exercised in such a manner as was consistent with the nature of the property and the use to which it was designed. But certainly the parties did not contemplate any such unqualified delivery of the pumping-engines as would wholly defeat the exercise by the Holly Company of its right to possession. Manifestly the engines were not to become inseparably incorporated with the real estate until they should be subjected to the prescribed "trial of their capacity and efficiency" and were accepted. Had they failed to meet the required test, the vendor would have been compelled to take them away.

Neither was it intended that the engines should be converted from personalty into realty until they were paid for. The Holly Company's right to "remain in and have full possession" of the engines plainly was inconsistent with such a conversion. All this, we think, is very clear. And we here observe that at the date of the contract Bullock & Co. were in possession of the real estate, and the legal title was in Bullock, for the transaction between him and H. S. Hopper—the deed to the latter, and his written acknowledgment—constituted only a mortgage. Bullock & Co., then, were in a position to stipulate as they did with respect to the Holly Company's lien for the purchase money and its right to maintain possession of the engines as additional security.

Is there any rule of public policy which will defeat the undeniable intention of the parties as the same appears on the face of the contract? Now while, by the settled law of Pennsylvania, where personal property is delivered under a conditional sale a provision in the contract preserving to the vendor the title until the property is paid for is void as respects execution creditors of the vendee, or an innocent purchaser from him, yet, as against the vendee himself, the seller may reserve the right of property in the goods until payment, and in default he may reclaim them, or resort to legal remedies. *Haak* v. *Linderman*, 64 Pa. St. 499; *Krause* v. *Com.*, 93 Pa. St. 421. All the Pennsylvania cases agree that such a reservation of title to the goods as security for the price is valid as between the parties themselves. *Peek* v. *Heim*, 127 Pa. St. 500, 17 Atl. Rep. 984; *Summerson* v. *Hicks*, 134 Pa. St. 566, 19 Atl. Rep. 808; *Levan* v. *Wilten*, 135 Pa. St. 61, 19 Atl. Rep. 945. In the very latest case on this subject,—*Hineman* v. *Matthews*, 138 Pa. St. 204, 20 Atl. Rep. 843,—where there was a sale of timber on an agreement that the title was not to pass until payment, but the vendee was permitted to remove the timber and convert it into lumber, and then failed to pay, whereupon the vendor took possession of the lumber, it was ruled that he could hold it against a subsequent execution creditor of the vendee. In *Harkness* v. *Russell*, 118 U. S. 663, 7 Sup. Ct. Rep. 51, upon an exhaustive review of the decisions, the conclusion was reached by the supreme court of the United States that by the general rule of law, unaffected by local statutes or local decisions, a conditional sale of personal property, accompanied by delivery, is valid both as against the parties and third persons; and it was further shown that by the almost unanimous opinion of the courts a purchaser buying with notice from the conditional vendee cannot hold the property as against the claim of the original vendor. The case of *Gregory* v. *Morris*, 96 U. S. 619, is instructive. There a contract of sale of cattle gave the vendor a lien thereon for the price, and authorized him to designate a person to go along with and retain possession of the cattle, who, upon non-payment, was to sell the whole or a portion of the cattle. The court sustained the lien as between the parties. Chief Justice WAITE, speaking for the court, said:

"The lien at common law of the vendor of personal property to secure payment of purchase money is lost by the voluntary and unconditional delivery of the property to the purchaser; but this does not prevent the parties from con-

tracting for a lien, which, as between themselves, will be good after delivery. So, ordinarily, when the possession of a pledge is relinquished, the rights of the pledgee are gone.   In this case, however, Morris was not willing to rely upon the lien which the law gave him as vendor, or upon a mere pledge of the property, but required a special contract on the part of Gregory, securing his rights.   This contract created a charge upon the property, not in the nature of a pledge, but of a mortgage. The lien, as between the parties, was not made to depend upon possession, but upon a contract, which defined the rights both of Morris and Gregory, and the power of Morris for the enforcement of his security."

That it was competent for the parties here to agree that the pumping-engine should remain personalty until paid for, is not to be doubted under the Pennsylvania authorities.   *Shell* v. *Haywood*, 16 Pa. St. 523; *Harlan* v. *Harlan*, 20 Pa. St. 303.   In *Shell* v. *Haywood*, *supra*, the court declared that the rule of severance and removal is one subject to the control and modification of the parties representing the property, who may vary the same according to their convenience, pleasure, or regard for right; for, (said CHAMBERS, J.,) "whether attached to the realty or not, or in whatever manner attached, is immaterial, when the parties agree to consider it personal property." All the Pennsylvania cases (and they deal with boilers, engines, and machinery generally) concur in the view that it is not the character of the physical connection which constitutes the test of annexation, but intention is the true legal criterion.   *Hill* v. *Sewald*, 53 Pa. St. 271; *Benedict* v. *Marsh*, 127 Pa. St. 309, 18 Atl. Rep. 26.   It was therefore held in *Vail* v. *Weaver*, 132 Pa. St. 363, 19 Atl. Rep. 138, that the engine, machinery, and appliances of an electric light plant erected upon and firmly attached to real estate do not pass to a purchaser of the real estate at a sale upon a mortgage of the realty, made and recorded before the plant was placed by the mortgagor on the mortgaged premises, unless it was the intention to make the plant a part of the realty when it was erected.   This decision seems to us to be a decisive answer to the argument that the pumping-engines, as after-acquired property, come within the grasp of the mortgage of April 1, 1887, to the Farmers' Loan & Trust Company, in such a manner that the Holly Company's lien was displaced.

This case belongs rather to that class of cases of which *U. S.* v. *Railroad Co.*, 12 Wall. 362, is the exponent, than to the class represented by *Porter* v. *Steel Co.*, 122 U. S. 267, 7 Sup. Ct. Rep. 1206.   The subject-matter of contest in the former of these two cases was after-acquired rolling stock of a railroad, which by the purchase contract was charged with a lien for the price.   To the proposition that a prior general mortgage which in terms covered after-acquired property attached to this rolling stock as soon as acquired, to the displacement of the contractual lien, the court, speaking by Mr. Justice BRADLEY, said:

"That doctrine is intended to subserve the purposes of justice and not injustice. A mortgage intended to recover after-acquired property can only attach itself to such property in the condition in which it comes into the mortgagor's hands.   If that property is already subject to mortgages or other liens, the general mortgage does not displace them, though they may be junior to it in point of time."

It was there added that the result would be different in the case of rails or other materials which became a part of the principal thing. In the case of *Porter* v. *Steel Co.*, *supra*, railroad bridges were the subject-matter of controversy. But rails and bridges necessarily become an actual part of the permanent structure of a railroad, and are inseparable from it without destruction to the road. In that respect they are like the stones and bricks of a house. But detachable and removable machinery is susceptible of ownership distinct from the land and buildings, and may be the subject of particular and separate liens. *Harlan* v. *Harlan*, *supra*; *Benedict* v. *Marsh*, *supra*; *Vail* v. *Weaver*, *supra*. In the present case it is clear from the terms of the contract of August 3, 1887, that the parties thereto did not intend that the pumping-engines should be converted from personalty into realty until paid for, and the evidence shows beyond any doubt that the engines can be easily detached from their fastenings, and removed without any injury to them or damage to the building.

We think it would be a work of supererogation to enlarge upon the proposition that, as against Samuel R. Bullock & Co., the Holly Company's contractual lien is good. They at least cannot gainsay its validity. Has the New Chester Water Company, upon the undisputed facts of this case, any better right? That company, indeed, was not formally a party to the contract of August 3, 1887, but, if regard be had to the substance of things, it must be treated in this matter as subject to the terms of the contract. For the purpose of the erection of the works at Chester, the water company, as we have seen, had put itself in the "absolute control" of Bullock & Co. In the expressive language of Mr. Bullock "the *personnel* of the New Chester Water Company was subordinated to the management, direction, and control" of his firm. To all intents and purposes the directors and other officials of the water company were the mere servants of Bullock & Co. It appears that some of the directors had positive knowledge of the terms of the contract with the Holly Company, and, under the circumstances, notice thereof is to be imputed to them all. Moreover, the open control which Lockman exercised over the pumping-engines was sufficient to affect the water company with notice of his principal's lien. But, in truth, with respect to this transaction, the distinction between Bullock & Co. and the water company is purely formal and fictitious. Bullock & Co. were the water company in everything but name. They really held the entire capital stock. Now, no court has ever yet decided that an incorporated company in this artificial capacity can be deemed to be ignorant of a matter affecting the company which is known to every individual stockholder. In our judgment, to treat the water company as a *bona fide* purchaser or possessor of the engines without notice of the contractual lien of the Holly Company would be unreasonable and unjust. The water company cannot honestly retain the engines without paying the balance of the purchase price. But to defeat the Holly Company the defendants invoke the decision in *Foster* v. *Fowler*, 60 Pa. St. 27, that the land and buildings of an incorporated water company

are not subject to a lien under the mechanic's lien act. The Holly Company, however, claims nothing under the mechanic's lien law, nor a lien of the character thereby given. It is asserting a contractual lien, which binds a certain removable piece of machinery, which was not delivered absolutely, but *sub modo*. It would, then, be a misconception of the principle of that decision to apply it here. If a water company should contract for a pumping-engine, to be paid for when set up and satisfactorily tested, would any one contend that, having got the engine within its walls, it could hold on to it without paying for it? But what difference does it make that a short credit of 60 days is given, the contract reserving to the vendor a lien with a possessory right as further security? We fail to see that any one has equities superior to those of the Holly Company. No rights of third persons have intervened. When William G. Hopper & Co. and R. D. Wood & Co. first acquired knowledge of the contract of August 3, 1887, is the subject of dispute; and the testimony is conflicting. Those firms, however, stood in close relations to Bullock & Co., and the facts about the contract for the pumping-engines were easily discoverable by them. The tripartite agreement of October 26, 1887, discloses that they were not unmindful of the possible existence of "liens ahead of the securities held by William G. Hopper & Co.," and it was thereby agreed that the firm should be protected by Wood & Co. against all such liens. Certain it is that neither of those firms advanced any money on the faith of the pumping-engines. Neither did the water company itself part with any of its bonds or stock on the faith thereof. Finally, it appears that the bonds of the water company are still in original hands, Hopper & Co. and Wood & Co., between them, owning substantially all of them, and really representing the whole issue.

But the jurisdiction of the court is challenged because of the joinder as co-plaintiffs with the Holly Company of Samuel R. Bullock & Co., whose true place the defendants contend is on their side; and it is insisted that when so placed the jurisdiction is gone, they being citizens of the same state with the Holly Company. Bullock & Co. were brought upon the record after the bill was filed by an amendment, which set forth that they joined as parties plaintiff, "not as seeking any special or distinct relief in the premises in this proceeding, but in affirmance of the rights of their co-plaintiff, the Holly Manufacturing Company, and in order to invest the court with full jurisdiction in the premises, so that a complete decree protecting the rights of all parties can be made." Their voluntary joinder, with respect to the Holly Company's supposed equitable rights against Wood & Co., is put upon the ground that Bullock & Co. stood to the Holly Company in the relation of trustees, holding the legal title to the contract; and, their interest being with that company, they might arrange themselves on the same side with it, agreeably to the principle recognized in *Railroad Co.* v. *Ketchum*, 101 U. S. 299. This position we need not discuss, our conclusion upon that branch of the case being adverse to the Holly Company, upon a consideration of the merits of the controversy. So far as the bill seeks to enforce the Holly Company's

lien, it is manifest that there is no dispute between the company and Bullock & Co. Samuel R. Bullock, indeed, was one of the principal witnesses in the case on behalf of the Holly Company to establish its lien, and hence a decree in its favor would conclude him and his firm, if there were any open question on that subject affecting them. But there is no such open question. The Holly Company is not seeking any relief, and needs no decree against Bullock & Co. It is urged, indeed, that that company is proceeding as for a foreclosure without making its debtor, who is the owner of the property, a party defendant. But this is a mistaken view. The ownership of the engines is not in Bullock & Co., and, in truth, was never intended to be in them, for in the purchase they acted in the interest and behalf of the New Chester Water Company. But there can be no longer any pretense of ownership in Bullock & Co., for Samuel R. Bullock, by his deed, has conveyed the title to the real estate to the water company. It is laid down in 2 Jones, Mortg. § 1404, that in an equitable suit for foreclosure the mortgagor, after he has conveyed the whole of the premises mortgaged, is not a necessary party to the suit. Moreover, Bullock & Co. have assigned all their interest in the bonds and stock of the water company to Wood & Co. Therefore they have no longer any interest, near or remote, in this particular controversy. They are altogether formal parties, whose presence does not oust the jurisdiction of the court, coming within the rule laid down in *Wormley* v. *Wormley*, 8 Wheat. 451, where the applied test was whether a decree was sought against the party. Here the Holly Company seeks to enforce a charge *in rem*, and Bullock & Co. have neither title to nor interest in the thing.

To the objection that the Farmers' Loan & Trust Company is not joined as a defendant in this suit, it is sufficient to say that, as substantially the whole body of bondholders is before the court, the presence of their trustee is wholly unnecessary. Moreover, the enforcement of the Holly Company's specific lien does not involve the validity of the trust mortgage, nor affect its standing as respects the principal mortgaged thing, the controversy relating to a mere incidental matter. Again, as the joinder of the trust company might oust the jurisdiction of the court, the omission to make it a party defendant is fully warranted by equity rule 47. That equity has jurisdiction to enforce liens, whether upon real or personal property, is clear. 2 Story, Eq. Jur. § 1216; 1 White & T. Lead. Cas. Eq. 1108, note to *Cuddee* v. *Rutter*. In *Schotsmans* v. *Railway Co.*, L. R. 2 Ch. App. 332, it was declared that a bill in equity will lie to enforce the claim for the price of goods of a vendor who, by the exercise of his right of stoppage *in transitu*, had reinvested himself with the legal title. Lord CAIRNS there said (page 340:)

"I should be prepared to hold this to be a case entirely within the province of this court, and depending on the ordinary principles which regulate in equity the relations of mortgagor and mortgagee, whether of real or personal property, although, for obvious reasons, cases of this kind are more generally and more conveniently brought into a court of law."

It will be remembered that in *Gregory* v. *Morris, supra*, Chief Justice WAITE observed that the contract there created a charge upon the cattle for the purchase-money in the nature of a mortgage. In *Fletcher* v. *Morey*, 2 Story, 555, 565, Judge STORY said:

"In equity there is no difficulty in enforcing a lien or any other equitable claim constituting a charge *in rem*, not only against real estate, but upon personal estate, or upon money in the hands of a third person, whenever the lien or other claim is a matter of agreement against the party himself and his personal representatives, and against every person claiming under him, voluntarily or with notice; * * * for every such agreement for a lien or charge *in rem* constitutes a trust, and is, accordingly, governed by the general doctrine applicable to trusts."

We have only to add that this case seems to be peculiarly one for a court of equity, in view of the situation of the property, and because the court can grant a reasonable time for the payment of the lien, and, in the event of a sale, may prescribe equitable terms.

Upon the whole case, then, we are of the opinion that the contractual lien of the Holly Manufacturing Company upon the pumping-engines here in question is valid and binding, and is enforceable in this suit. Counsel may prepare and submit the draft of a decree in accordance with the views expressed in this opinion.