## Haldeman v. Haldeman, et al.

### (Decided July 28, 1917.)

### Appeal from Jefferson Circuit Court (Chancery Branch, First Division).

1. Corporations—Agreement Among Stockholders as to Management—When Invalid.—An agreement between three stockholders of a corporation to vote their stock so as to maintain two of them in their positions as officers of the corporation, and in the management thereof, is not binding upon, and will not be enforced against, an unwilling stockholder who was not a party to the contract; and, the fact that the non-signing stockholder knew of the existence of the contract between the other three stockholders cannot affect the rights of the non-signing stockholder.

2. Corporations—Agreement Among Stockholders as to Management—Written Agreement.—The fact that a written agreement between three stockholders in a corporation to vote their stock on all occasions to retain two of them as officers, and in the management of the corporation, was filed in a pending chancery suit brought for the purpose of settling the estate of the father of the parties to the contract, did not add anything to the agreement, or enhance its dignity, since no attempt was made in the settlement suit to construe the agreement, or determine its legal effect.

3. Corporations—Directors—When Court of Equity Will Not Restrain Exercise of Powers.—In the absence of a charge of fraud against the directors of a corporation, a court of equity will not restrain them from exercising their powers as directors, so long as they act within the powers conferred upon them by law; if they have the power to adopt a resolution, the motives of the members of the board in doing so do not constitute a legitimate question for the court's consideration.

4. Executors and Administrators—Wish of as to Management of Newspapers.—Where the testator directed his executors to continue the publication of the testator's newspapers for ten years, and to employ both of his sons, at a liberal salary, in the management of the papers, the wish of the executor thus expressed will be given no controlling effect after the expiration of the ten-year period.

5. Corporations—Management of Daily Newspaper—Differences Among Directors—Equity.—In the management of a daily newspaper owned by a corporation, a court of equity will not consider as material or relevant the personal differences of the directors concerning the management of the paper, or the merits of their respective positions on pending public questions, or the charge that the plaintiff was temperamentally, or otherwise, unfit to act as president or business manager of the paper, since all of these questions are to be determined by the board of directors.

6. Corporations—Government of Majority of Stockholders—Right of Appeal.—Each and every stockholder in a corporation contracts that the will of the majority shall govern in all matters coming within the limits of the act of incorporation; and, in cases involving no breach of trust, but only error or mistake in judgment upon the part of the directors who represent the company, individual stockholders have no right to appeal to the courts to dictate the line of policy to be pursued by the corporation.

7. Corporations—Enforcement of Contract by Stockholders—Vote of Stockholders.—A stockholder of a corporation may vote as he pleases, and public policy forbids the enforcement of a contract by which a stockholder undertakes to bargain away his right to vote for directors according to his best judgment, and in the interest of the corporation. A stockholder has no right to disable himself by contract from performing his duty.

8. Specific Performance—When Equity Will Not Undertake.—A court of equity will not undertake the specific performance of a contract which, on account of its many complicated and difficult questions, is incapable of being specifically enforced.

9. Corporations—Power of Directors May Be Delegated to Executive Committee.—Under the clear weight of authority, the power of a board of directors may be delegated to an executive committee of that board; and the acts and contracts of such a committee may be made binding on the corporation.

10. Corporations—Appointment of Receiver—Equity.—The power of a court of equity to appoint a receiver of a corporation, either because it has no properly constituted governing body, or because there are such dissensions in its governing body as to make it impossible for the corporation to carry on its business with advantage to its stockholders, is well settled; but, it is equally well settled that this power is subject to certain limitations, namely, it must always be exercised with great caution, and only to such limit and to such extent as may be necessary to preserve the property of the corporation and protect the rights and interest of its stockholders.

HELM BRUCE and JAMES QUARLES for plaintiff.

ALEX P. HUMPHREY, EDWARD P. HUMPHREY, BENNETT H. YOUNG, and ROBERT W. BINGHAM for defendants.

OPINION BY JUDGE MILLER.—Dissolving injunction.

The Courier-Journal Company, incorporated, and having a capital stock of 600 shares of the par value of one thousand dollars per share, owns and publishes "The Courier-Journal," a morning newspaper at Louisville. The Louisville Times Company, likewise incorporated, with one thousand shares of capital stock of the par

value of one dollar per share, owns and publishes "The Louisville Times," an evening newspaper, at the same place.

At the time of his death, in 1902, Walter N. Haldeman, the founder of both papers, owned 525 shares of the capital stock of the Courier-Journal Company, and 875 of the Louisville Times Company shares. Henry Watterson owned the remaining 75 shares and 125 shares in the respective companies. For many years Walter N. Haldeman had been the president and business manager of both corporations; and, for a like period, Mr. Watterson had been the editor of "The Courier-Journal."

By his will, Walter N. Haldeman bequeathed his newspaper properties to his three children, W. B. Haldeman, Bruce Haldeman, and Isabel Haldeman, equally. For several years previous to his father's death, Bruce Haldeman had assisted him in the management of the papers, and had had full control of the business of the papers during his father's annual extended visits to his properties in Florida; and, since Walter N. Haldeman's death, Bruce Haldeman has been president and business manager as the successor of his father. Mr. Watterson has continued as editor of "The Courier-Journal," and W. B. Haldeman has been and is now the first vice-president of the company, and editor of "The Times" newspaper.

Upon the final settlement of their father's estate, W. B. Haldeman, Bruce Haldeman and Isabel Haldeman signed a writing on May 22, 1912, which contained a clause reading as follows:

"Sixth: That so long as all three of the children are alive Bruce Haldeman as President, and W. B. Haldeman as Vice President or director, are to have the management of the Louisville Courier-Journal Company and the Louisville Times, and that the stock of the Courier-Journal Company allotted to Isabel Haldeman in this division will be on all proper occasions voted to retain them in said management, each of them to be paid a reasonable salary for his services, she to have the right to name one member of the Board of Directors."

This writing, containing many other agreements concerning the settlement and division of Walter N. Haldeman's estate, was filed in the suit then pending in the Jefferson circuit court for the settlement of that estate, and was approved by the court. In this way W. B., Bruce, and Isabel Haldeman each became and is now

the owner of 175 shares in the "Courier-Journal Company," and one-third of 875 shares in the "Louisville Times Company," Mr. Watterson owning the remaining shares in each company, as above recited.

Bennett H. Young was elected a director upon the nomination of Isabel Haldeman; and he, in conjunction with W. B. Haldeman, Bruce Haldeman, and Henry Watterson, constitute four of the present six directors of the two companies, the other two members being nominal directors for the purposes of the organization.

Since 1912, the two corporations have been conducted and the papers published under the management above outlined—Bruce Haldeman being president and business manager of both companies, Mr. Watterson editor of "The Courier-Journal," and W. B. Haldeman as first vice president and editor of the "Times."

At a meeting of the board of directors of the Courier-Journal Company, held on May 9, 1917, resolutions were adopted, over Bruce Haldeman's vote and protest, providing (1) for an executive committee consisting of directors W. B. Haldeman, Bruce Haldeman, and Bennett H. Young to take direction and control of the business of the "Courier-Journal" and "Times" companies; (2) for a business manager who should be president of both companies; (3) for two independent editorial managers to be under the control of the executive committee; (4) appointing the defendant Young general counsel for the two corporations; and (5) prescribing certain business regulations.

Conceiving that these resolutions violated the agreement of May 22, 1912, above set forth, and, if put into effect, would deprive him of his office of president and business manager of the corporations, Bruce Haldeman, on June 16, 1917, filed this action against W. B. Haldeman, Isabel Haldeman and Bennett H. Young to enjoin and restrain them from acting under the resolutions of May 9, 1917, and for a mandatory injunction requiring W. B. Haldeman and Bennett H. Young to take the necessary steps, as directors, to effect a rescission of the resolutions by the board of directors.

The petition, moreover, alleges that the words "the management of the Louisville Courier-Journal Company and the Louisville Times" as used in clause "sixth" of the agreement of May 22, 1912, embraced the editorial as well as the business departments of the newspapers, and was so understood by the parties to the contract; and,

that "said right is one of vital importance and great value to the plaintiff as a stockholder in said corporations, in this, that not only the popular respect, favor and patronage enjoyed by said newspapers depends in very large measure upon what appears in their editorial and news columns, but said corporations are apt to become involved in large liability to other persons from the publication of improper matter in said newspapers, and thereby to be required to pay out large sums in damages."

The petition further sets forth specifically the causes which led to the plaintiff's disapproval of the editorial management of the two papers; the subsequent rupture between the plaintiff and the other officers and directors of the corporation; and, alleges that W. B. Haldeman had confederated with the defendant Young in the passage of the resolutions of May 9th.

Henry Watterson was not made a defendant, but upon his application he was allowed to file his intervening petition in which he shows he is a shareholder in the two corporations, to the extent heretofore indicated; that he was not a party to the agreement of May 22, 1912, and did not know its contents until recently; that the prosperity of the corporations and their papers depends upon a wise management by competent officers and boards of directors; and, that the corporations are in no way to be bound or affected in their management by the personal agreement of May 22, 1912, between three of their stockholders.

Subsequently, at the direction of the court, the plaintiff made the two corporations, the "Courier-Journal Company" and the "Louisville Times Company," defendants to the action.

The answers traversed the material allegations of the petition; and, as defenses to the action they alleged (1) that the agreement of May 22, 1912, which is the basis of this action, insofar as it attempts to perpetuate Bruce Haldeman and W. B. Haldeman as officers and in control of the two newspapers, is void because it is in violation of public policy; (2) that the conduct of Bruce Haldeman has been so arbitrary and unreasonable in the management of the papers as to make harmonious action between him and the other directors impossible, and, for that reason, the agreement of May 22, 1912, if valid, is impossible of performance; and (3) that "The Courier-Journal Company" and "The Louisville Times Com-

pany" are corporations organized under the laws of
Kentucky, and in accordance with the existing statutes
of the state regulating corporations, which require the
stockholders to elect the directors and the directors to
elect the officers of the two defendant corporations; that
W. B. Haldeman and Isabel Haldeman own 58 per cent.
of the stock in each paper, and that they, with Henry
Watterson, own more than 70 per cent. of the stock;
and (4) that Henry Watterson was not a party to the
agreement of May 22, 1912, and as the owner of stock
of the par value of more than $75,000.00, he has the
right to have the corporations administered according
to the statute regulating corporations.

In avoidance of the last defense, plaintiff rejoined
that Mr. Watterson knew of the existence of the contract
of May 22, 1912, and approved it.

The chancellor granted the plaintiff's prayer, by en-
joining W. B. Haldeman, Bennett H. Young, and Isabel
Haldeman (the former two both individually and as di-
rectors), and the Courier-Journal Company and the
Louisville Times Company, (1) from taking or assisting
in taking from Bruce Haldeman the business manage-
ment of the two corporations, or either of them, as pres-
ident thereof; (2) from creating or from participating
in the creation of the office of business manager of either
of the corporations, or any office, under whatever name,
whose incumbent is to perform the duties of the same
name and character which Bruce Haldeman has per-
formed since his father's death in 1902, and covered by
the agreement of May 22, 1912; and (3) from excluding
or assisting in excluding Bruce Haldeman from partici-
pating in or supervision over the editorial management
of either of the corporations or the newspapers published
by them, of the same character and to the same extent as
he has exercised since the death of his father, and cov-
ered by the agreement of May 22, 1912.

1.   In eliminating from the case its immaterial fea-
tures and issues, the claim that Mr. Watterson knew of
the contract of May 22, 1912, between the Haldeman heirs,
will first be noticed.

As to this issue it is sufficient for the purposes of
this case to merely say that the record furnishes no evi-
dence which even tends to support the plaintiff's con-
tention.   On the contrary, the only proof upon the sub-
ject is the uncontradicted testimony of Mr. Watterson
that it was never shown to him; that he only heard of

its existence by chance not exceeding a year ago; that he never saw or read its text until these proceedings were begun; and that he at no time approved the agreement, his acquiescence being limited to his aim and effort to keep the peace and avoid litigation.

In disposing of this point adversely to the plaintiff, upon the facts, it is not to be inferred, however, that the result would be different if Mr. Watterson had known the contents of the agreement at the time it was made in 1912. As he was not a party to the agreement, and could not have prevented its execution by the adults who proposed to affect only their own property rights, it is difficult to understand how he could be affected by it. The agreement, by its terms, does not name Mr. Watterson or attempt to bind him or his property. And, as the Haldeman heirs were the actors, there can be no estoppel against him; and, none is claimed. It is hornbook law that the courts will not make a contract for the parties; it will only interpret and enforce the contract which the parties themselves have made. Johns v. Masterson, 176 Ky. 399, 195 S. W. 819.

2. It was strongly pressed in the argument, that the agreement of May 22, 1912, between the Haldeman heirs, was given additional force by the fact that it was filed in the chancery suit brought to settle Walter N. Haldeman's estate, and was approved by the court. That fact did not, however, add anything to the agreement or enhance its dignity. In any event, the agreement is concontrolled by its terms; and, the filing of it in the case and its approval by the court, did not add to or detract from its terms. It was not the subject of the action, and the court made no attempt to construe it. It contained seven separate and distinct clauses relating to as many subjects connected with the final settlement and distribution of W. N. Haldeman's estate, including charges and advancements to be made against the several heirs; a provision for holding the "Naples Property" in Florida indefinitely, and the sale, by the executors, of the other realty; an amicable settlement of the controversy over the construction of the will; and the payment by the estate of the advertising bills of the Wintersmith Chemical Company—the estate holding stock of the par value of $15,000.00 in that company. As it related to the settlement of matters raised in the case, it was only proper that the agreement should be lodged there in order that the rights under it should be protected in the final set-

tlement of the executors to be thereafter accordingly made, as was provided for under the first clause of the agreement. Any one of several clauses of the agreement made it not only proper, but necessary, for it to be filed in the case as a guide to the executors in their final settlement. And, in making the settlement of disputed questions, the heirs naturally embraced them all in one paper, since they depended upon each other. But no attempt was made, in that case, to construe the sixth clause relating to the voting of the stock of the three heirs. And, if it should be contended that the filing and approval by the court gave judicial sanction to the provision that Bruce Haldeman and W. B. Haldeman should have the management of the papers so long as the three heirs should live, and that Isabel Haldeman's stock should be "on all proper occasions voted to retain them in said management," the question still remains, how is her stock to be voted? By what method is the management of Bruce Haldeman and W. B. Haldeman of the papers to be retained?

These are the questions uppermost in this case; and, the act of the court in filing the agreement and giving its approval, has not carried us a single step in its interpretation. The chancellor was called upon in this case, for the first time, to spell out the meaning and legality of this agreement.

3. Equally immaterial is the charge of confederation between W. B. Haldeman and Bennett H. Young in procuring the adoption of the reorganization resolutions by the board of directors. If it be material or pertinent, there is no proof to sustain the charge, and it must fail for that reason. There is no charge of fraud against any of the directors. And, if the board of directors had the power to adopt the resolutions, the motives of its members in doing so is not a legitimate question for discussion. The courts are concerned with the rights of parties to act, not with the motives which induced them to act. If the legality of the act of a director of a corporation depended upon the motive which actuated him, every act of the directory might be questioned, and its validity would depend, not upon the rights of the parties under the law, but upon the ethical reasons which had induced the directors to exercise their legitimate powers.

4. Counsel upon either side have placed emphasis upon those provisions of Walter N. Haldeman's will which related to the management of his newspaper prop-

erties after his death.  He directed his executors to continue publishing the papers for ten years, and to employ both of his sons, at liberal salaries, in their management; the nature and character, however, of such services, to be arranged by agreement between his sons, and, in case of their disagreement, the position and duties of each should be fixed by the executors.  Mr. Haldeman further directed, however, that the papers should be so continued under the general management of his sons, and under the advice and direction of his friend and business associate, Henry Watterson; the financial part to be under the control of his executors.  And, in case of disagreement between his sons about the management and conduct of the papers, all matters affecting the same should be decided by his wife, if living, or, if she should be dead, by Henry Watterson and his executors, other than Bruce Haldeman.

Walter N. Haldeman's executors were his widow, Mrs. Elizabeth Haldeman, Bennett H. Young, and Bruce Haldeman.  Mrs. Haldeman is dead, and the ten-year period provided for the continuation of the papers by the executors expired in 1912, when the heirs became the owners of the newspaper properties, free of the limitations placed upon them by the will.

It follows, therefore, that the estate of Walter N. Haldeman having been long since settled and distributed according to the provisions of his will, those provisions have no application, and afford no legal standard in determining the rights of his children to their property. But, it is not believed that Mr. Haldeman contemplated that any desire of his should be dominant in the management of these two great newspaper properties for a longer period than ten years.  He was too good a business man not to have seen that conditions might so change during the period of ten years that the views he held at the time of his death might be unwise and inappropriate after the expiration of that period.  And, while he directed his executors to employ both of his sons in the management of the newspapers, treating them with equal love and generosity, he was careful to put the financial management under the control of his executors.  And, in case of disagreement between his sons about the management and conduct of the papers, his widow, if living, should decide between them, but if she should be dead, their differences were to be settled by Henry Watterson and the testator's executors, other than Bruce Halde-

man. If this provision of the will is to prevail now, the differences between W. B. Haldeman and Bruce Haldeman should be settled by Henry Watterson and Bennett H. Young. But, neither of the sons is claiming that this provision of the will is binding upon him, and could not successfully do so. And, even less could he claim it to be binding upon the other. It is, therefore, laid aside.

5. Furthermore, the court cannot consider as material or relevant the personal differences of the parties concerning the management of the two papers, or the merits of their respective positions upon the great state and national questions now upon the stage, or the charge that plaintiff is temperamentally or otherwise unfitted to act as president and business manager of the papers. This must follow from the fact that if the agreement of May 22, 1912, as construed by the plaintiff is to control, it disposes of the question of plaintiff's fitness, and the parties must abide by their contract. The question at issue, however, is the validity and effect of the contract.

6. After stripping the case of these irrelevant and immaterial issues, it is apparent that the case reduces itself to the single proposition of the validity and effect of the contract of May 22, 1912, between the Haldeman heirs. That is the only pertinent legal question in the case, and the plaintiff must, of necessity, maintain his position under and by virtue of that agreement, or fail. If the contract runs counter to the statute regulating the election of directors of a corporation by its stockholders, and the election of its officers by its directors, it is in vain to argue that the contract should prevail over the statute.

Turning to the statute law of Kentucky, we find that it not only provides for the creation of corporations, but it specifically provides the manner of their control and management.

Section 551 of the Kentucky Statutes provides that the affairs of each corporation shall be managed by a board of not less than three directors, each of whom shall hold not less than three shares of stock, while section 551 provides that directors shall be elected by the stockholders. Section 552 provides that persons holding stock in a fiduciary capacity shall be entitled to vote the shares so held, and makes further provision for cumulative voting for the purpose of protecting the rights of minority stockholders. And, section 542 provides that a corporation shall have the power to appoint, remove and elect

officers, and define their duties; and, as the affairs of corporations are managed by directors, the directors necessarily exercise the powers given the corporation by the statute.

These two corporations owe their existence to these statutory enactments, and are, of necessity, controlled by them. Clearly, if the law as declared by the legislature is to control, a personal agreement between three of the stockholders providing for a control directly in conflict with the method pointed out by the statute, can avail nothing.

The vital question, therefore, which confronts us at the threshold of the case is, shall the law prevail, or the contract made by the parties in direct violation of the law?

There can be but one answer to this question; the law must prevail.

The far-reaching effect of the injunction granted by the chancellor will be appreciated when it is observed that it goes not only against two directors, but also against both corporations, although neither corporation is a party to the contract of May 22, 1912, which is the only basis for the relief granted. And, to the indefinite extent pointed out in the order, it places the editorial management, as well as the full business management, under the supervision of the plaintiff, to the exclusion of the board of directors.

The two enjoined directors, W. B. Haldeman and Bennett H. Young (representing Isabel Haldeman), represent more than fifty-eight per cent. of the capital stock of the corporations, and, in conjunction with Henry Watterson, more than seventy per cent.; thus placing the management of the papers, indefinitely, in the hands of the plaintiff who owns twenty-nine per cent. of the capital stock.

It must also be borne in mind, that the contract sued on is not the contract of all the stockholders; on the contrary, Henry Watterson, who owns a large block of the stock, was not a party to the contract; has never consented to it; and is now denying its validity, insofar as it concerns him or his property.

Moreover, this is not a case where a corporation by a vote of its board of directors has contracted with a person to perform the duties of manager, or other duty, for a stated period and for an agreed consideration.

There is no claim that it is the contract of the corporation; it is only contended that the contract made between the three stockholders is binding upon the remaining dissenting stockholder upon the theory that he had knowledge of its existence. But, as heretofore stated, Mr. Watterson, the dissenting stockholder, did not know of the existence of the contract, and would not be bound by it if he had known it.

So the case, in its final analysis, reduces itself to the consideration of this single proposition: can three stockholders, by a personal contract between themselves for the management of the corporate business, enforce the contract either as to themselves, or against a dissenting stockholder?

At the outset, it may be well to recur to some of the elementary rules of law applicable to corporate stockholders and officers.

A stockholder occupies a position and owes a duty radically different from a director. A stockholder may in a stockholders' meeting, vote with the view of his own benefit; he represents himself only. But, a director represents all the stockholders; he is a trustee for them; and he cannot use his office for his personal benefit at the expense of any stockholder. An individual director has no authority as such; he can only act as agent by appointment, like other agents are appointed.

Moreover, directors must act together, as a board; the separate assent of a majority is not binding on the corporation. Neither can they vote by proxy.

These rules arise from the very nature of corporate business, which must be conducted by agents.

And, as between themselves, the majority rule prevails.

In the leading case of Dudley v. Kentucky High School, 9 Bush 576, Judge Lindsay, speaking for the court, said:

"Each and every stockholder contracts that the will of the majority shall govern in all matters coming within the limits of the act of incorporation; and, in cases involving no breach of trust, but only error or mistake of judgment upon the part of the directors who represent the company, individual stockholders have no right to appeal to the courts to dictate the line of policy to be pursued by the corporation."

Again, in Manufacturers Land & Improvement Co. v. Cleary, 121 Ky. 403, the court, at some length, dis-

cussed the respective relations of a stockholder and a director to his corporation, saying:

"Those who embark in a corporate enterprise as stockholders impliedly agree that its affairs shall, so far as they are confined to the scope of the business set out in the articles of incorporation, be controlled by a governing board, selected in the manner provided in the articles and in accordance with the law, and that the corporation shall endure for the purpose for which it was organized for the entire period fixed by the articles, unless sooner dissolved by operation of law. The judgment or discretion of the governing body, usually a board of directors, as to matter *intra vires,* is entirely beyond the control of the stockholders through the intervention of the courts, except for frauds committed or threatened against the corporation or the minority stockholders. An exception to this general rule is where the corporate enterprise is one impossible of execution. But whether the plan being executed by the governing body is wise, or even where it may not involve the corporation in ultimate losses, is a matter that the courts could not inquire into or remedy, without exercising a jurisdiction of espionage and censorship utterly inconsistent with the rights of property as recognized by the common law. The corporation owns its property. It has the same right to manage it according to its judgment, which is evidenced by the judgment of its directors, so long as it acts within the scope of its corporate powers, as any individual has his own property. No court is ever permitted to interfere with an owner's control of his property so long as it is lawful, no matter how foolish it may be. Corporate ownership of property is the same as individual ownership, so far as the right of management is concerned, except that for certain purposes the corporation is held to be a trustee of the corporate property for the benefit of its creditors and stockholders; that is, of creditors to the payment of their debts, of stockholders to the honest employment of the assets in the corporate enterprise. Only in the event of abuse of this implied trust is a court of equity warranted in interfering with the corporate management."

The courts will not interfere with this management confided in the officers of the corporation so long as it keeps within the limits of its charter, and does not act fraudulently. It recognizes the fact that a director is a trustee for the stockholders, and that it is his duty to con-

duct the business of the corporation in accordance with the laws relating to such directors, and not according to the wishes or opinion of some objecting stockholder. Fountain Ferry T. R. Co. v. D. & C. Jewell, 8 B. M. 140; Croninger v. Bethel Grove Camp Ground Association, 156 Ky. 362.

Again, in Graham v. McAdoo, 135 Ky. 677, the court further said:

"The general rule is, as stated by counsel for appellants, that the courts will not interfere with the management of a majority unless there is actual fraud, or such a wasting of the corporate property as practically amounts to fraud."

The remedy of a dissatisfied stockholder was well stated by Chancellor McGill in Benedict v. Columbus Construction Co., 49 N. J. Eq. 36, as follows:

"If stockholders in a corporation disapprove of the company's management, which is conducted without fraud, or by action not *ultra vires,* or not in gross abuse of trust, or shall consider their speculation a bad one, their remedy is to elect new officers or sell their shares and withdraw."

There is no suggestion that the board of directors has ever acted fraudulently, or that it has in any way wasted the property of the corporation, or jeopardized its interest.

Passing, therefore, the question of fraud, which is not presented, and looking to the legality of the act of the board of directors, it will be observed that the resolution attacked in this case provided for the appointment of an executive committee to manage the affairs of the two corporations. While there might have been, in the early history of corporations, some doubt as to the right of the board of directors to delegate any part of its powers to an executive committee, it is now settled beyond controversy that the board of directors may exercise that power.

The modern rule is formulated in Cook on Corporations, 6th ed., vol. 3, sec. 715, as follows:

"There formerly was some doubt as to whether the powers of a board of directors might be delegated to an executive committee. The right of the board of directors to delegate to agents generally the transaction of the ordinary and routine business of the corporation is unquestioned, and indeed is absolutely necessary. But in

matters involving discretion there are decisions to the effect that the directors cannot delegate that discretion. The clear weight of authority, however, holds that the powers of a board of directors may be delegated to an executive committee of that board, and the acts and contracts of such a committee may be made binding on the corporation.''

See also Thompson on Corporations, 2nd ed., vol. 2, sec. 1207, to the same effect.

·In providing for an executive committee to manage the business affairs of the corporations, the board of directors clearly acted within its powers.

7. There is this other salutary and well-established principle that prohibits the granting of the relief asked by the plaintiff: Although a stockholder may vote as he pleases, public policy forbids the enforcement of a contract by which a stockholder undertakes to bargain away his right to vote for directors according to his best judgment, and in the interest of the corporation. He has no right to disable himself by contract from performing this duty. These defendants not only owe this duty to the corporations, they represent as directors, but they also owe it to Mr. Watterson, the other stockholder, who was not a party to the contract. He has a right to demand of the stockholders a faithful performance of their obligations under the law. And, he has the further right to demand that each director discharge his duty as such, not in accordance with his personal interest or any personal contract, but in the best interest of the corporation they represent. Otherwise, he is not a director in fact, but is a mere automaton. If a "dummy" director should vote contrary to the wishes of the stockholder who made him a director under a contract that he would by his vote carry out the wishes of the stockholder, there is no law that would invalidate such a vote.

The question is, not whether W. B. Haldeman or Bruce Haldeman is fitted for the position he holds, or whether it would be wise to depose them from office, or limit their authority, but whether a stockholder can contract away his duty to vote according to his own discretion and his honest judgment, in the best interest of the company.

This question was before the Supreme Court of the United States in the leading case of West v. Camden, 135 U. S. 507. In that case Camden, a stockholder in an oil company, contracted to make West the president of

the oil company and keep him there. A few years later, however, West was displaced as president, whereupon he sued Camden for damages, under his contract. There was no dispute about the contract; but the Supreme Court of the United States said an agreement by a stockholder of a corporation to keep another person permanently in place as an officer of the corporation is void as against public policy, even though there was not to be any direct private gain to the promisor.

In the course of its opinion in that case the court said:

"This state of facts serves clearly to bring the case within the principle of the ruling in Fuller v. Dame, 18 Pick. 472, and Guernsey v. Cook, 120 Mass. 501; that is to say, it was a contract the purpose and effect of which was to influence the defendant as a stockholder and officer of the company, 'in the decision of a question affecting the private rights of others, by considerations foreign to those rights,' and the defendant, by the contract, was placed under direct and very powerful 'inducement to disregard his duties to other members of the corporation, who had a right to demand his disinterested action in the selection of suitable officers.' He was to be in a relation of trust and confidence, which would require him to look only to the best interest of the whole, uninfluenced by private contracts. We think this salutary rule is applicable in this case, notwithstanding the alleged contract was not corruptly made for private gain on the part of the defendant. There were other stockholders in the company. The defendant and the Standard Oil Company, for whose benefit it is alleged the contract was made, were not all the stockholders, and it seems to us that it was certainly the right of those other stockholders to have the defendant's judgment, as an officer of the company, exercised with a sole regard to the interests of the company."

West v. Camden, supra, stands at the head of a long line of cases laying down the same salutary rule.

See Singers-Bigger v. Young, 166 Fed. 82; Hampton v. Buchanan, 51 Wash. 155; Morel v. Hoge, 130 Ga. 625; Cone's Exor. v. Russell, 48 N. J. Eq. 208; Jackson v. Hooper, 76 N. J. Eq. 592; Sauerhering v. Rueping, 137 Wis. 407; Woodruff v. Wentworth, 133 Mass. 309; Teich v. Kaufman, 174 Ills. App. 306; Gage v. Fisher, 5 N. D. 297; Scripps v. Sweeney, 160 Mich. 148; Greenhood on Public Policy, pages 292, 336, et. seq.

The cases of Ecker v. Kentucky Refining Co., 144 Ky. 264, and Jones v. Williams, 139 Mo. 1, 37 L. R. A. 682, relied upon by counsel for plaintiff as establishing a rule contrary to the one above announced, are not at all applicable to the facts presented in this case.

In the Ecker case, a dissenting stockholder objected to the creation of a salaried special or executive committee to control the affairs of the corporation; and the court merely decided that the right of the stockholders in the corporation to create a voting trust for a lawful purpose, to-wit, the protection and promotion of the best interest of the company, was not unlawful. The existence of the corporation depended upon the agreement of the stockholders to place the management of the corporate affairs in the hands of a competent executive committee. The agreement provided that the persons who should manage the business should be made directors, and they were made directors. That was the only way in which the contract could be lawfully executed.

But, the contract between the Haldeman heirs in the case at bar is not a voting trust for the promotion of the best interest of the corporation; it is, on the contrary, merely a private contract by some of the stockholders for their personal benefit. If the three Haldeman heirs had, pursuant to agreement, voted their stock for the election of directors and the directors had created an executive committee to manage the affairs of the corporations, we would then have had a case similar to the Ecker case; but, when two of them owning more than fifty-eight per cent. of the entire stock of the corporation declined, as directors, to join the other party to the contract in voting in the board of directors, we have an entirely different case, and one that is controlled by entirely different legal principles.

In Jones v. Williams, *supra,* the court enforced a contract between Jones, the editor of the paper, and the corporation which had employed him; it presents no question of the specific performance of a contract between stockholders looking to the control and management of the corporation.

8. Finally, a court of equity will not undertake the specific performance of a contract which is impossible of performance.

If the contract be treated as valid, innumerable complicated and difficult questions must arise in its enforcement. As an instance: Has the court power to direct

stockholders how they shall vote in their selection of directors, and can it instruct directors how to vote in the election of officers of the corporation? No case has been cited in which a court of equity ever commanded a director how he should vote, unless pursuant to a contract made by the corporation. .

Again, if the contract be valid, should the court attempt to require or continue the joint control of these two corporations by two persons whose views in regard to the management are utterly irreconcilable? It.is the consideration of such difficult questions of administration as these.that has made the rule which necessarily limits the power and functions of a court of equity in the enforcement of contracts.

Furthermore, if the contract is to prevail, the court is equally bound to determine the fitness of W. B. Haldeman and Bruce Haldeman for the positions they now hold, or may hereafter hold, in these two corporations, and the extent of the authority which each should possess, a discretion which is vested by law entirely in the board of directors. It would require the court to exercise its judgment and to substitute it for the judgment of the stockholders in the first instance, and the board of directors in the second.

If the court should tell the stockholders how to vote in an election for directors, and the directors how to vote for officers, and should then tell the directors what power and authority they should give those officers, it is perfectly apparent that the court would supplant the stockholders and the directors in their chief functions, and would, in a short course of time, be called upon to give its guiding hand to every corporation which contained a dissatisfied stockholder; for, if this be the law, every stockholder would take care, in advance, to secure himself by a proper contract.

The successful administration of the law wholly forbids that it should recognize or undertake to give effect to so impractical a proposition. On the contrary, the statute points out a simple and feasible way of conducting a corporation and its business. The stockholders own it; the directors manage it. There is no such thing known to the law as a joint control by the officers of the corporation and the court, for the good reason that the court would certainly nominate the officers, under such circumstances. The court recognizes no partner with itself in the administration of the law; it either controls

absolutely, through its receiver, the business intrusted to it, or it dismisses the parties, thus permitting them to attend to their business.

In Edison v. Edison United Phonograph Co., 52 N. J. Eq. 625, the court well expressed the rule, as follows:

"The power of this court to appoint a receiver of a corporation, either because it has no properly-constituted governing body or because there are such dissensions in its governing body as to make it impossible for the corporation to carry on its business with advantage to its stockholders, I think must be regarded as settled; but I think it is equally well settled that this power is subject to certain limitations, namely, it must always be exercised with great caution and only for such time and to such an extent as may be necessary to preserve the property of the corporation and protect the rights and interests of its stockholders. As soon as a lawfully-constituted and competent governing body comes into existence, whether it is brought into existence by an adjustment of the dissensions or by the election of a new body, and such body is ready to take possession of the property of the corporation and proceed in the proper discharge of its duties, the court must lift its hand and retire."

The only way in which the agreement could be enforced would be for the court to affirmatively control the board of directors by requiring it to vote in a particular way. But, this has never been done, except in a few cases, and then only where the contract was made by the corporation. Here the contract is between stockholders only.

The agreement and the injunction based upon it contemplate an indefinite management of both papers by the plaintiff; the board of directors is superseded; the innocent stockholder has no rights which he can protect; the stock of defendants will have no salable value, although it constitutes a majority, because it will carry no voting power with it; and, creditors are deprived of their contract rights acquired under the law which assured them that the affairs of the corporation would be managed by the board of directors. Neither the law nor the parties to the contract of May 22, 1912, ever contemplated such a result as being possible.

That a perpetuation of the injunction would wreck these newspapers, is apparent and beyond a doubt. It is not meant that this result would follow from the man-

agement of either of the contending parties, but from the attempted joint control of antagonistic forces. In the meantime, the fortunes of all the stockholders, regardless of their several relations to the contract, would be jeopardized, while the chancellor, wholly unversed as editor or publisher, vainly endeavored to determine whose ideas as to running two daily newspapers were right, wrong, or politic.

This inevitable result can only be avoided by applying the statute, under which all questions of policy, of management, of the expediency of contracts or action, are left solely to the honest decision of the directors. To hold otherwise, would be to substitute the judgment and discretion of others in the place of those agreed upon by the scheme of incorporation.

It follows, therefore, that whether we rest the decision of this case upon the imperative demands of the statute, which declares that a corporation acting through its properly constituted and elected directors, must control and manage it, or upon the law of public policy which annuls the contract of May 22, 1912, or upon the impossibility of its performance, the result is the same. Under either view, the plaintiff has no case.

The injunction granted by the chancellor is dissolved.

Chief Justice Settle, and Judges Carroll, Hurt, Clarke and Sampson heard the argument upon the motion to dissolve the injunction, and concur in this order of dissolution.