PACIFIC RAILROAD *v.* KETCHUM.

1. An appeal will not be dismissed upon the ground that the decree from which it was taken was rendered by consent; but no errors will be considered here which were in law waived by such consent.

2. A recital in the decree that it was assented to by the solicitor of one of the parties is equivalent to a direct finding that he had authority to do what he did, and, so far as the question is one of fact only, is binding upon this court on appeal.

3. The ruling in *Removal Cases* (100 U. S. 457), on the second section of the act of March 3, 1875 (18 Stat., part 3, 470), stated and declared to be applicable to the jurisdiction of the Circuit Court, as the same is prescribed by the first section of that act.

4. For the purpose of an appeal, this court need not inquire when the Circuit Court first obtained jurisdiction of the suit. It is sufficient if that court had jurisdiction when the decree appealed from was rendered.

5. The purchase by the solicitor of a railroad company of its property at a judicial sale, made pursuant to a decree in a foreclosure suit, is not of itself necessarily invalid. It will, however, be closely scrutinized, but until impeached must stand.

APPEAL from the Circuit Court of the United States for the Eastern District of Missouri.

This case presents the following facts: —

On the 10th of July, 1875, the Pacific Railroad, a Missouri corporation, mortgaged its road and other property to Henry F. Vail and James D. Fish, trustees, citizens of New York, to secure a proposed issue of bonds amounting, in the aggregate, to $4,000,000. This mortgage will hereafter be referred to as the "third mortgage." The bonds were to bear date as of May 1, 1875, and become payable twenty years thereafter, with interest at the rate of seven per cent, falling due semi-annually on the first days of May and November in each year. The principal object of this new issue was to take up by exchange or otherwise outstanding income and improvement bonds of the company, amounting in all to $3,500,000. The mortgage contained a clause to the effect that, if the company should fail to pay the interest on any of the bonds thereby secured, for six months after the same became due and payable, and demand made therefor, or if the principal of any of the bonds, when payable, should not be paid for six months after demand, the trustees might, on the written request of holders of bonds to the amount of $500,000, the principal or interest of which should then be in arrear and unpaid, sell the mortgaged property at public auction, in the city of St. Louis, giving notice thereof in a manner particularly specified, and execute and deliver conveyances to the purchaser, applying the proceeds of the sale to the payment of the bonds.

The property mortgaged was covered by other mortgages. One was to Uriah A. Murdock, James Punnett, and Luther C. Clark, citizens of New York; another, to Edwin D. Morgan and Joseph Seligman, also citizens of New York; another, to Rufus J. Lackland and Dwight Durkee, citizens of Missouri; another, to James Baker, a citizen of Missouri, and Jesse Seligman, a citizen of New York; and all were prior in lien to the third mortgage.

Default having been made in the payment of the interest falling due Nov. 1, 1875, on the bonds secured by the third mortgage, George E. Ketchum, a citizen of New York, claiming to be the owner and holder of many of the bonds, commenced this

suit in the court below, on the 11th of November, in behalf of himself and the other bondholders, to foreclose the mortgage. To this suit the railroad company and the trustees of all the mortgages, including Vail and Fish, were made defendants, their citizenship being fully set forth in the bill. The superior right of all the prior mortgages was conceded, and it was also admitted that the full amount of their authorized issues was outstanding, but it was alleged that the interest on all except that secured by the third mortgage had been paid promptly as it matured, and that there was then no default. It was also alleged that the value of the property was greater than the amount of all the prior liens.

The bill further stated that about $2,000,000 of the income and improvement bonds had been exchanged for the bonds secured by the third mortgage, and that about $300,000 of the last-named bonds had been negotiated otherwise than by exchange, and were then outstanding. It then alleged the non-payment of interest falling due Nov. 1, 1875, after due demand made; that there was a large amount of money due for taxes; that the company was without means to pay them and its valid obligations in full as the latter became due; that its commercial paper had been protested; that it was liable to actions, suits, and proceedings on account thereof; and that there was great danger that the property covered by the mortgage might be attached or levied upon under execution or other legal process.

The bill then proceeds as follows: " Your orator further shows unto your honors that an application has been made by your orator, on behalf of himself and other holders of bonds secured by said mortgage to the defendants Henry F. Vail and Henry D. Fish, to take proceedings to foreclose the aforesaid mortgage, and to protect the interest of your orator and such other holders; but that no such proceedings have been taken, and as your orator is informed and believes, some doubt is expressed whether, under such mortgage, they have the right to institute such proceedings, or any proceedings thereunder, by reason of the non-payment of the interest due Nov. 1, 1875, and for such reason prefer not to take such proceedings; and your orator being apprehensive that his interest and the interests of

other holders of like bonds may be seriously affected by delay in the institution of proceedings to foreclose said mortgage and "to obtain possession of said property, has brought this action in his own behalf, and on behalf of all others similarly situated and holding like bonds secured by said third mortgage, and has made said Vail and Fish parties defendant herein."

The prayer was that the mortgaged property might be sold subject to the liens of the prior mortgages, and that, if necessary, an account might be taken. There was also a prayer in the usual form for the appointment of a receiver.

Process was duly issued and served on the 13th of December, 1875, on such of the defendants as were citizens of Missouri, and on the 8th of January, 1876, an order was taken for service on the non-resident defendants in the manner required by the rules of the court; but it does not appear that any such service was actually made. On the same 8th of January, one Thomas P. Akers, representing that he was a stockholder of the company, that the mortgage sued on was a fraud, and that the corporation would not resist the suit, asked that he might be permitted to come in as a defendant to protect his interests. On the 7th of February, 1876, the company filed an answer, in which it substantially confessed all the allegations of the bill, and asserted the binding character of the bonds and mortgage. The answer concluded, however, as follows: "But it says that it is informed that a portion of said stockholders claim that they are fraudulent and void, and that the directors of this defendant were guilty of fraud in issuing the same. Therefore, this defendant asks this honorable court to permit any of the stockholders aforesaid to become a party defendant to this suit, upon a proper showing, and make such defence in the premises as they may see proper." James Baker signed the answer as solicitor of the company, as did also the secretary of the company, and the corporate seal was affixed.

On the 16th of February, Cornelius K. Garrison and James Seligman, citizens of New York, and Thomas W. Pierce, a citizen of Massachusetts, representing themselves to be owners of $1,797,000 of the bonds secured by the third mortgage, were admitted into the suit as complainants with Ketchum, and united with him in the allegations of his bill. On the 25th of

March, 1876, Peter Marie, Frank A. Otis, Robert L. Cutting, Jr., James D. W. Cutting, citizens of the State of New York, and George R. Fearing, a citizen of Rhode Island, all stockholders in the company, asked to be made co-defendants with Thomas P. Akers, with leave to defend the suit. On the 3d of April, a receiver was appointed with the usual authority, and Vail and Fish, as trustees, were authorized to exchange the bonds secured by the third mortgage for the income and improvement bonds in accordance with the terms of the mortgage, and Akers and the county of St. Louis were given leave to file a cross-bill in thirty days. No action was taken on the petition of other stockholders to be made parties. On the 25th of April, Akers and St. Louis County filed an answer and cross-bill, in which the county of St. Louis set up a lien adverse to that of the mortgage; and both defendants alleged that the mortgage was executed in fraud of the rights of creditors and stockholders, stating particularly the defences which the company had thereto.

On the 5th of June, 1876, an adjourned term of the court was held, and all the several trustees of the prior mortgages filed answers, setting up in form their respective mortgages and stating the amounts due. Each answer concluded with the statement that the answering defendant knew of no reason why the prayer of the bill should not be granted. On the next day, Vail and Fish, as trustees, filed their answer, admitting all the allegations in the bill, and concluding as follows: " And these defendants, as trustees of the several and varied interests of the bondholders secured by said deed of trust, submit the same to the judgment of this honorable court, that the same may be duly provided for and protected, and ask that they may have such relief, including an allowance for the costs and expenses herein, as to your honorable court may seem meet." On the same day, Akers and St. Louis County dismissed their cross-bill and withdrew their answer without prejudice to the lien claim of the county. This being done, all the several parties appeared in court by their respective solicitors, and the court having found, among other things, the amount of income and improvement bonds of the company outstanding, and that the entire amount of the bonds secured by the third mortgage had

been issued, some, however, being still in the hands of the trustees to complete the contemplated exchanges; that Ketchum was the owner of ten of the bonds, Garrison of fourteen hundred, James Seligman of three hundred and forty-seven, and Pierce of fifty, and that the interest due Nov. 1, 1875, had not been paid, although demanded, it was, "by the consent of all parties to the suit, through their solicitors of record," adjudged and decreed " that the said Pacific Railroad do stand absolutely barred and foreclosed of and from all equity of redemption of, in, and to said mortgaged premises, property, and franchises," and that the mortgaged property, &c., be sold at public auction, subject to the liens of the several prior mortgages, by a master, who was named, to pay and satisfy the amounts due by the company upon the bonds, and any other indebtedness the court might order paid out of the proceeds, "together with the costs of suit and of said sale, including the services of said trustees, and their solicitors' and attorneys' fees in and about the management of said trust, as may hereafter be ordered by the court." Provision was also made for notice of the time and place of sale, and a conveyance to the purchaser after confirmation. The terms of sale were fixed by the decree, and if the purchase was made by or for the bondholders, all but $200,000 of the purchase-money could be paid by a surrender of bonds, provision being made for paying such of the bondholders as did not come into the purchase their *pro rata* share of the proceeds. Sixty days' time was given after the sale for all bondholders to come in and associate themselves with the purchasers, if the purchase should be made on account of the bondholders. Leave was also given the trustees of the mortgage to continue exchanges for the income and improvement bonds still outstanding. It was also ordered that nothing in the decree should be construed to prejudice in any manner the claim of St. Louis County, which had been set forth in its answer and cross-bill.

The property was sold under this decree to James Baker for the benefit of the bondholders. He had acted in the cause as solicitor of the company. On the 18th of September, a motion was made to confirm the sale. On the 22d of September, N. A. Cowdrey, Robert L. Cutting, Jr., Peter Marie, Frank A. Otis, Jacob Cromwell, George L. Kingsland, citizens of New York,

and George R. Fearing, a citizen of Rhode Island, stockholders in the company, filed a petition in court asking that they be made defendants in the suit, that the sale might be set aside, and that they have leave to defend, alleging the fraudulent character of the mortgage, and that the directors were acting in bad faith towards the stockholders. This motion was denied, and on the 23d of October the sale was confirmed and a conveyance to Baker, the purchaser, ordered. On the 27th of January, 1877, the Pacific Railroad took this appeal.

*Mr. Matt. H. Carpenter* and *Mr. N. A. Cowdrey* for the appellant.

*Mr. George F. Edmunds, Mr. James O. Broadhead,* and *Mr. Melville C. Day, contra.*

Mr. Chief Justice Waite, after stating the facts, delivered the opinion of the court.

The first question with which we are met is one of jurisdiction. It is contended on the part of the appellees that a consent decree in the Circuit Court cannot be appealed from, but we do not so understand the law. Sect. 692 of the Revised Statutes provides that an appeal shall be allowed from all final decrees in the circuit courts, &c., when the matter in dispute exceeds $5,000, and that this court " shall receive, hear, and determine such appeals." This makes appeals to this court, within the prescribed limits, a matter of right, and requires us, when they are taken, to hear and decide them. If, when the case gets here, it appears that the decree appealed from was assented to by the appellant, we cannot consider any errors that may be assigned which were in law waived by the consent, but we must still receive and decide the case. If all the errors complained of come within the waiver, the decree below will be affirmed, but only after hearing. We have, therefore, jurisdiction of this appeal.

This brings us at once to the inquiry whether the appellant, the Pacific Railroad, did consent to the rendition of the decree appealed from. It is stated affirmatively on the record that all parties, through their solicitors, did consent; but the appellant insists that its solicitor had no authority in that behalf. Early in the progress of the cause the company filed an answer

under its corporate seal, and signed with its authority by its secretary and solicitor of record, in which every material allegation in the bill was confessed, and it was, moreover, positively stated that the bonds sued for were in all respects valid obligations of the company and the mortgage a subsisting lien. In every instance in which the stockholders attempted to get into the case as parties, so that they might defend for the corporation, it was asserted that the directors of the company were false to their trust, and that they had either consented to, or would not resist, a decree. A solicitor may certainly consent to whatever his client authorizes, and in this case it distinctly appears of record that the company assented through its solicitor. This is equivalent to a direct finding by the court as a fact that the solicitor had authority to do what he did, and binds us on an appeal so far as the question is one of fact only. The remedy for the fraud or unauthorized conduct of a solicitor, or the officers of the corporation, in such a matter, is by an appropriate proceeding in the court where the consent was received and acted on, and in which proof may be taken and the facts ascertained. We take a case on appeal as it comes to us in the record, and receive no new evidence. Here the record states in terms that the company assented to all that has been done. This is equivalent to an admission by the company on the record that the facts exist on which the decree rests. On an appeal, therefore, we must take all the facts as admitted, and consider only whether the case is one in which, under any state of facts, the decree could be entered. The record showing as it does affirmatively that the company gave its consent to the decree, we need not inquire what we would do if the case depended alone on the consent of the solicitor. It may be true also that under the peculiar provisions of this charter the stockholders have a sort of supervisory power over the doings of the directors; but they cannot avoid what has been done by the directors in a suit pending in a court against the company, except by the employment of such remedies as are consistent with the orderly course of judicial proceedings. They cannot correct errors arising from what has thus been done by appeal any more than the company can. If they have been defrauded, they must apply for relief in

the first instance to the court in which the fraud was perpetrated.

This disposes of all mere errors in form which are alleged against the decree. Parties to a suit have the right to agree to any thing they please in reference to the subject-matter of their litigation, and the court, when applied to, will ordinarily give effect to their agreement, if it comes within the general scope of the case made by the pleadings. It was within the power of the parties to this suit to agree that a decree might be entered for a sale of the mortgaged property without any specific finding of the amount due on account of the mortgage debt, or without giving a day of payment. It was also competent for them to agree that if the property was bought at the sale by or for the bondholders, payment of the purchase-money might be made by a surrender of the bonds. And so of all the other provisions of the decree which are complained of. All these were matters about which the parties might properly agree; and having agreed, it does not lie with them to complain of what the court has done to give effect to their agreement. Although this appeal may have been instigated by the stockholders in opposition to the wishes of the directors, it is still the appeal of the company which was one of the parties to the agreement, and must be treated accordingly.

This leaves for our consideration under the appeal from the decree of sale only the question which was most strenuously pressed in the argument, that is to say, whether the court below had jurisdiction of the cause so as to authorize it to enter any decree. The objection is, that as Vail, Fish, Joseph Seligman, Punnett, Clark, Morgan, Murdock, and Jesse Seligman were all citizens of the same State with Ketchum and the several parties who in the progress of the cause were admitted as co-complainants with him, the suit was not between citizens of different States, and therefore not within the jurisdiction of the Circuit Court.

The first section of the act of March 3, 1875 (18 Stat., part 3, 470), provides " that the circuit courts of the United States shall have original cognizance . . . of all suits of a civil nature at common law or in equity, where the matter in dispute

exceeds, exclusive of costs, the sum or value of $500, . . . in which there shall be a controversy between citizens of different States. . . . "

The same general language is used in the second section of the same act in respect to the removal of suits from the State courts, and in *Removal Cases* (100 U. S. 457) we held it to mean that when the controversy about which the suit was brought was between citizens of different States, the courts of the United States might take jurisdiction without regard to the position the parties occupied in the pleadings as plaintiffs or defendants. For the purposes of jurisdiction, the court had power to ascertain the real matter in dispute, and arrange the parties on one side or the other of that dispute. If in such arrangement it appeared that those on one side were all citizens of different States from those on the other, jurisdiction might be entertained and the cause proceeded with. That ruling, we think, applies as well to the first section as to the second.

For the purposes of this appeal we need not inquire when the Circuit Court first got jurisdiction of this suit. It is sufficient if it had jurisdiction when the decree appealed from was rendered. As no objections were made by the parties in the progress of the cause to the right of the court to proceed, and the decree when rendered was consented to, it is enough for the purposes of this appeal if the record shows that when the consent was acted on by the court jurisdiction was complete. Consent cannot give the courts of the United States jurisdiction, but it may bind the parties and waive previous errors, if when the court acts jurisdiction has been obtained.

The subject-matter of this action was the foreclosure of the third, or Vail and Fish, mortgage. As the case was made by the bill there could be no controversy, that is to say, no dispute, with any of the trustees of the earlier mortgages, because their liens were admitted and their interest had been paid in full as it matured. No relief was asked against them. All that Ketchum wanted was a foreclosure of the mortgage in which he was interested, subject to their admitted prior claims. In no possible way could their interests be injuriously affected if the facts set forth in the bill were true. To

the bill as filed and the case as afterwards made, these trustees were but nominal parties. They would be bound by what might be done, but all they could by any possibility claim was conceded.

This leaves only to consider the position occupied by Vail and Fish. When the suit was begun, as well as when the decree was rendered, they were trustees of the mortgage under which Ketchum and his co-complainants claimed. No allegations were made against them. All that was said about them was that they doubted their right to proceed. There was no antagonism between them and Ketchum and his associates. He wanted them to proceed; they did not know that they had the legal right to do so. In the mean time he, thinking his own rights, as well as those of his associate bondholders, would be injuriously affected by delay, commenced the suit to get done just what the trustees, if they had been willing to proceed, might have done. Whatever he did was for the trustees and in their behalf, and he really had no power to do more than they might have done if they had been so inclined. It is needless to inquire what might have been the result if they had seen fit to dispute the right of the complainant bondholders to go on. They did not do so, but, on the contrary, before the decree was rendered, came in and substantially availed themselves of the suit which had been begun, so that in the end the suit, in legal effect, became their suit. Although nominally defendants according to the pleadings, they voluntarily, in the course of the proceedings, arranged themselves on the same side of the subject-matter of the action with the complainants. This they had the legal right to do. After that, clearly the controversy was between citizens of one or more States on one side and citizens of other States on the other side, and when the decree was rendered the only thing to be done was to foreclose the mortgage sued on, as between the trustees of the mortgage acting with their beneficiaries and the railroad. Of such a suit the Circuit Court had jurisdiction, and its decree is, consequently, binding on the parties until set aside in the regular course of judicial proceedings.

This leaves only the question arising on the confirmation of the sale. The only objection here insisted on is that Baker,

the purchaser, was the solicitor of the appellant company. His purchase, although nominally in his own name, was actually by and for the bondholders. He was used to hold the title until the bondholders could organize and take it. While purchases at judicial sales in the name of the solicitors and attorneys of parties whose property is sold will be scrutinized with jealous care, they will be sustained if no injustice is thereby done to the parties they represent. Here the company, whom Baker represented as solicitor, confessed *its inability to* pay the debt it owed, and consented that the property held as security be sold. In the decree which it assented to, special provision was made for a purchase by or for the bondholders. We can see no harm which will result from permitting the solicitor of the company to take the title for the bondholders under such a purchase. No complaint was made below of actual wrong. The only objection was that such a purchase was inconsistent with the duties of the solicitor. There was no speculation by the solicitor in the purchase. All he did was to hold the title until the real purchasers were in a condition to take it themselves. If there had been any proof of collusion or improper conduct on the part of the solicitor, resulting in wrong to the company, the case would be different. As it is, we are called upon to decide whether a purchase in the name of the solicitor of one whose property is sold is necessarily in and of itself invalid. We think it is not. It will be scrutinized closely, but until impeached must stand. Slight circumstances may impeach it, but it is not under all circumstances invalid.

After a careful consideration of the whole case, we are unable to discover any error that can be corrected by appeal.

*Decree affirmed.*