**LEVITAN et al. v. STOUT et al.**
*Civ. No. 1615.*

United States District Court
W. D. Kentucky, at Louisville.
April 14, 1951.

Herbert Monsky, Louisville, Ky., Harold F. Levin, Morton Roth, New York City, Milliken & Handmaker, Louisville, Ky., for plaintiffs.

Louis Lusky, Wilson W. Wyatt, and Wyatt & Grafton, all of Louisville, Ky., for defendants Samuel E. Stout, Edwin O. Dulaney, Tinsley W. Rucker, III, John L. Farris and W. L. Lyons.

SHELBOURNE, Chief Judge.

This is a stockholder derivative action brought by certain stockholders of General Plywood Corporation (hereinafter referred to as "The Corporation"). The named defendants are the Corporation, on whose behalf the action is brought, and six individuals—Samuel E. Stout, Edwin O. Dulaney, Tinsley W. Rucker, III, Calvin M. Hilton, John L. Farris, and W. L. Lyons—who are alleged to have been directors or former directors of the Corporation. According to the allegations of the amended complaint, which for present purposes must be taken as true, the essential facts are as follows:

The plaintiffs own common stock in the Corporation. One of the plaintiffs has held such common stock since September 24, 1946. The plaintiffs are citizens of New York and New Jersey.

The Corporation was organized August 27, 1945. It is a Kentucky corporation having its principal office in Louisville.

The individual defendants are Kentucky citizens except Farris, who is a citizen of Georgia.[1]

The defendants Stout and Rucker were members of the Corporation's Board of Directors from the date of incorporation down to the date this action was brought. The defendant Lyons was a director of the Corporation from about November 1945, down to the date this action was brought. The defendants Dulaney, Hilton and Farris were directors from the date of incorporation until about August 27, 1948. At the time this action was commenced—on March 7, 1949—the Board of Directors of the Corporation consisted of six directors.

From the date of incorporation down to the date this action was brought, the defendant Stout was chairman of the Board of Directors of the Corporation, and the defendant Rucker was one of its vice-presidents. From the date of incorporation until August 27, 1948, the defendant Dulaney was president of the Corporation, the defendant Hilton was one of its vice-presidents, and the defendant Farris was its secretary.

From August 27, 1948, down to the date this action was brought, the defendant Farris was one of the vice-presidents of the Corporation.

The Corporation has 600,000 shares of common stock outstanding, each share having a par value of 50¢. The plaintiffs own an aggregate of 8,000 shares. The defendant Stout, at all times since the date of incorporation, has owned at least 32.10% of the outstanding common stock and the defendant Dulaney, who is his son-in-law, has owned at least 8% of said common stock. (Until about April 1947, the defendant Dulaney owned about 15% of said common stock).

The amended complaint alleges that the remaining stock, being listed by and traded upon the New York Curb Exchange, is scattered among stockholders throughout the United States and that the defendant Stout, by virtue of his 32.10% stock ownership had "effective and actual voting control of said Corporation." It alleges further that this control was augmented by the voting power of the defendant Dulaney, who is said to have joined his voting power with that of his father-in-law in order to control the election of directors.

It is further alleged that the defendants Stout and Dulaney controlled and dominated the actions of the directors.

The gist of the action is that the individual defendants managed the affairs of the Corporation incompetently and negligently, with resulting damage to the Corporation, and that they kept the defendant Dulaney in office as president despite his allegedly demonstrated incompetence, because he and his father-in-law, exercising their alleged control through stock ownership, required them to do so.

The amended complaint, then describes, in considerable detail, a series of business transactions to which the Corporation was a party. These allegations may be summarized as follows:

a. *Plywood barrels.* Shortly after the Corporation was organized, it began to manufacture plywood whiskey barrels. At

---

1. All of the defendants are before the Court except Hilton, who has not been served.

that time the use of plywood barrels was not authorized by the Alcohol Tax Unit of the Bureau of Internal Revenue, and (until such authority should be granted) whiskey stored in such barrels could not be so labeled as to make its sale commercially feasible. Nevertheless the Corporation made contracts to supply such barrels to several distilling companies, which contracts were cancellable at the option of the purchasers, and made a heavy investment in plant and equipment for the manufacture of such barrels at a cost of at least $130,000. The Corporation undertook experimental and developmental work in connection with the project, and manufactured a number of the barrels. The distilling companies cancelled their purchase contracts. The Corporation consequently suffered an alleged loss of approximately $500,000.

The amended complaint alleges that, in causing the Corporation to embark upon this project, the individual defendants acted with "gross culpable negligence in complete disregard of the interests of" the Corporation.

It will be noted that the amended complaint does not allege that the plywood barrel program was undertaken, or that any of the $500,000 loss was attributable to, expenses incurred subsequent to September 24, 1946, the earliest date on which any of the plaintiffs is alleged to have acquired his stock.

b. *Veneer Products, Inc.* The amended complaint alleges that, in November 1945, the Corporation purchased from Joe K. Hays and others (referred to in the amended complaint as "Associates") two-thirds of the Class B common stock of Veneer Products, Inc. The agreement for the purchase of this stock provided that General Plywood would pay to Associates $8,000 in cash; would cause Veneer Products, Inc. to issue $155,000 of debentures, payment of which would be guaranteed by General Plywood Corporation; that $126,000 of such debentures would be issued to Associates; that General Plywood Corporation, for a period of five years, would purchase the entire output of Veneer Products, Inc., which was usable in any of its operations or processes; and that Veneer Products,

Inc. would designate the Hays Company, in which the Associates were interested, as its exclusive sales agent at a commission of 5% of net sales.

The amended complaint alleges that, at the time of the foregoing transactions, Veneer Products, Inc., had been operating unsuccessfully and that its capital was impaired; that the purchase price paid for its stock was excessive and unreasonable; and that the 5% sales commission amounted to a gift to the Hays Company, since the Corporation's agreement to buy the entire usable output of Veneer Products, Inc., rendered the services of a sales agent superfluous.

It is alleged that the amount paid to the Hays Company as sales commission was more than $113,000, which constituted a waste of the assets of the Corporation, and that the Corporation suffered further losses in an amount not presently determinable by reason of its guarantee of the debentures and the payment of the allegedly excessive price for the stock of Veneer Products, Inc. It is alleged that the individual defendants, in carrying out the foregoing transaction, acted with "gross culpable negligence in complete disregard of the interests of" the Corporation.

Again, it will be observed that the amended complaint fails to allege that any of the alleged acts of negligence took place subsequent to September 24, 1946, the earliest date on which any of the plaintiffs is alleged to have acquired his stock.

c. *Costa Rican timber.* The amended complaint alleges that the Corporation purchased timber rights in Costa Rica and proceeded to cut timber in excessive quantities, in unseasonable weather, and in such a negligent and improperly supervised manner that much of said timber was unsatisfactory for commercial use or was usable only for low-grade plywood.

It is alleged that the individual defendants "acted negligently and without proper care" in selecting employees to supervise and execute the project, and "failed to exercise proper supervision and control of the persons so selected."

The Corporation is alleged to have suffered loss in the amount of at least $400,000 by means of said alleged "culpable negligence, incompetence, and waste."

d. *Plywood toilet seats.* The amended complaint alleges that the Corporation negligently embarked upon the manufacture of plywood toilet seats, at a time when the usability of plywood for this purpose had not been established, and without any reasonable probability that there was a commercial market for such toilet seats.

It is alleged that large numbers of the toilet seats were manufactured and had to be disposed of at a loss. The Corporation is alleged to have incurred a loss of at least $400,000 as a result of the "culpable negligence, incompetence and waste of corporate funds" in the said project, which is alleged to have been undertaken "negligently and with reckless disregard of the welfare of the Corporation."

e. *Expansion program.* The amended complaint alleges that the individual defendants, "negligently and with reckless disregard for the welfare" of the Corporation, caused it to undertake a huge expansion program without any reasonable probability that the additional plant facilities and equipment would be used; that, by reason of said alleged over-expansion, operations were suspended from time to time in several of the Corporation's plants; and that operational losses resulted. It is further alleged that, in an effort to keep the said plants in operation, the Corporation entered into further lines of manufacture, including furniture and prefabricated houses, which turned out to be unprofitable. It is alleged that the total cost of the additional plant facilities was about $3,200,000, and that the expansion program, under the circumstances, constituted "culpable negligence, waste and mismanagement."

It is alleged generally that losses resulted from the idleness of plant facilities and from the furniture and prefabricated houses project, but it is not alleged that the expansion program resulted in any over-all loss to the Corporation.

f. *Disadvantageous financing.* The amended complaint alleges that in 1948, the funds of the Corporation having been depleted by the losses referred to above, it became necessary to obtain new capital by means of a preferred stock issue. About $800,000 was raised, most of which was used to pay off debts of the Corporation. Some or all of the individual defendants had guaranteed these debts of the Corporation.

Later in 1948 the Corporation borrowed an additional $750,000 at 4½% interest under a general mortgage of its plants and equipment. All or nearly all of these funds were used to pay off debts of the Corporation, including debts which one or more of the individual defendants had guaranteed.

It is alleged that the purpose of this mortgage loan was, in part, to relieve the individual defendants from said personal liability.

It is not alleged that the said financing arrangements were, under the circumstances, negligent or unwise, or that, in themselves, they resulted in any loss to the Corporation.

g. *Disadvantageous employment contracts.* The amended complaint alleges that in 1948, upon the resignation of the defendant Dulaney as president and director, the Corporation made an "improvident contract" employing Carl M. Robbins as president for five years at a salary of $35,000 a year plus a bonus of 7½% of the Corporation's net earnings before taxes, the bonus being subject to a $15,000 minimum, plus a one-year option to buy 50,000 shares of the common stock of the Corporation on very liberal credit terms.

At the same time Jesse H. Lide was employed at $20,000 a year with a similar option for 15,000 shares of common stock and Irving W. Clark was employed at $1,000 a month with a similar option for 5,000 shares of common stock.

Aside from the reference to the Robbins contract as "improvident" it is not alleged that the foregoing employment arrangements were negligent or unwise, or that they resulted in any loss to the Corporation.

The amended complaint alleges generally that all of the foregoing transactions other then the employment arrangements and the

mortgage financing were undertaken "negligently and with reckless disregard to the welfare of" the Corporation; that in the continuance of the defendant Dulaney in office as president, the individual defendants were motivated, among other things, by the fact that he was the son-in-law of the defendant Stout "who held voting control" of the Corporation; that the defendants Rucker, Hilton and Farris, as salaried officers of the Corporation, were dependent for their salaries on the continued good will of the defendants Stout and Dulaney; and that the defendants Rucker, Hilton and Farris acted under the domination and control of the defendants Stout and Dulaney, rather than independently.

The amended complaint contains no allegation that, at any time prior to the commencement of this action, any stockholder made a demand on the Corporation's Board of Directors or on the stockholders of the Corporation, for the institution of legal action against the individual defendants to redress the alleged wrongs to the Corporation. Instead, the amended complaint sets forth facts which, the plaintiffs contend, establish the fact that such demands would be futile.

It is alleged that demand on the Board of Directors would have been futile because three of the six directors who were in office at the commencement of the action are defendants herein and presumably would not authorize action against themselves, or permit such an action to be vigorously prosecuted if it were instituted. It is alleged that demand on the stockholders of the Corporation would have been futile because the stockholders, as such, have no authority to require the Corporation to commence legal action; because ownership of the 60% of stock not held by defendants is scattered; and because a proxy fight, under the circumstances, would have imposed a great financial burden on the plaintiffs.

It is not alleged, however, that a demand on the stockholders could not have been made at the next annual meeting of the Corporation, or that the stockholders (although unable themselves to make the Corporation commence an action) would have been powerless to elect a majority of directors who would be committed to such action, or that the delay involved in waiting for an annual meeting of stockholders would have been prejudicial to the Corporation.

In this connection it may be noted that the original complaint contained an allegation, omitted in the amended complaint which was filed after the individual defendants had filed their briefs, to the effect that the next annual meeting of stockholders was to take place late in March 1949. This action was commenced March 7, 1949. There is no indication that limitations would have run before the end of the month; and in fact, the need for haste is somewhat negatived by the fact that the original complaint was verified January 19, 1949, some six weeks before the action was commenced.

As for the demand on the Board of Directors, it is a fair inference from the allegations of the amended complaint that the Articles or By-Laws of the Corporation provided for seven directors; seven directors were in office from March 22 to August 27, 1948, and it is not alleged that the authorized size of the Board was reduced thereafter. Thus, there was presumably a vacancy on the Board at the time this action was commenced, which in the normal course of events would have been filled at the annual meeting of stockholders. It follows that, although half of the six-man Board which was in office at the time the action was commenced were defendants in the action and could have vetoed action by the Corporation, there was a substantial possibility that such a deadlock would be broken when the seventh director was elected.

### Motions of the Individual Defendants

The individual defendants have filed three motions. First, they move to re-align the Corporation as a party plaintiff. Second, they move to dismiss the action because, the Corporation being so re-aligned, there is no complete diversity of citizenship so that the Court lacks jurisdiction over the subject-matter; because the plaintiffs have not exhausted their corporate remedies, as required by Rule 23(b) of the Rules of Civil

Procedure, 28 U.S.C.A.; and because they are not charged with any acts which would render them liable under the Kentucky law relating to the duties of corporate directors. Third, they move to strike certain allegations of the complaint on the ground that they refer to acts done prior to the acquisition of stock by the plaintiffs; certain other allegations on the ground that they fail to specify any acts of the individual defendants constituting a breach of duty to the Corporation; and still other allegations on the ground that they fail to allege any facts which tend to show a breach of duty to the Corporation.

Briefs in support of these motions were filed. The plaintiffs then filed an amended complaint. In the opinion of the individual defendants the amended complaint did not affect the essential basis of the motions, and they moved the Court to consider each of the motions as being directed to the amended complaint. Answering briefs were filed by the plaintiffs. After oral argument, the individual defendants filed two supplementary memoranda of law and the plaintiffs filed one such supplemental memorandum.

Although this Court might properly limit itself to a decision of such of the motions as are necessary to make a full disposition of the case, it seems appropriate to pass on all the motions which are before the Court. In the event of an appeal, the appellate court will then have the benefit of this Court's views, for what they may be worth, on all the points at issue. This course is in accordance with the desire of the parties, as expressed by their Counsel at the oral argument.

### The Motion to Re-Align.

The motion to re-align the Corporation as a party plaintiff should be granted. KRS 271.605 provides—"In a suit brought to enforce a secondary right on the part of one or more shareholders of a corporation, because the corporation has refused to enforce rights which may properly be asserted by it, the corporation by such shareholder or shareholders shall be the plaintiff (For example: X Corporation by John Doe, Shareholder) and the petition shall allege the ownership of shares by such share-holder or shareholders at the time of the transaction complained of or that such ownership devolved on such shareholder or shareholders by operation of law. The petition shall also set forth with particularity the effort of such shareholder or shareholders to secure from the directors and, if necessary, from the other shareholders the desired action, and the reasons for failure to obtain such action or the reasons for not making such effort to obtain such action."

Thus, there can be no doubt that if this action had been instituted in a Kentucky State Court, the Corporation would have had to be named as plaintiff. The only question, then, is whether KRS 271.605 imposes a purely procedural requirement which has no applicability in a Federal Court, or whether it embodies a substantive rule which must be respected by the Federal Courts in diversity cases under Erie R. R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188.

The distinction between procedural and substantive rules has been carefully analyzed in a number of recent decisions dealing with the applicability of the Erie case. The most directly relevant of these decisions is Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528. There the question was whether, in a stockholder derivative action, the Federal Courts are bound to apply a statute of the forum State which makes the plaintiff, if unsuccessful, liable for all expenses of the defense including attorneys' fees, and requires him to give security for their payment as a condition of prosecuting the action. The Supreme Court held that the New Jersey statute embodied a rule of substantive law and that the Federal Courts were therefore bound to follow it. The Court said, in part,—337 U.S. at pages 549, 550, 69 S.Ct. at page 1227:

"The very nature of the stockholder's derivative action makes it one in the regulation of which the legislature of a state has wide powers. Whatever theory one may hold as to the nature of the corporate entity, it remains a wholly artificial creation whose internal relations between management and stockholders are dependent upon state law and may be subject to most

complete and penetrating regulation, either by public authority or by some form of stockholder action. Directors and managers, if not technically trustees, occupy positions of a fiduciary nature, and nothing in the Federal Constitution prohibits a state from imposing on them the strictest measure of responsibility, liability and accountability, either as a condition of assuming office or as a consequence of holding it.

"Likewise, a stockholder who brings suit on a cause of action derived from the corporation assumes a position, not technically as a trustee perhaps, but one of a fiduciary character. He sues, not for himself alone, but as representative of a class comprising all who are similarly situated. The interests of all in the redress of the wrongs are taken into his hands, dependent upon his diligence, wisdom and integrity. And while the stockholders have chosen the corporate director or manager, they have no such election as to a plaintiff who steps forward to represent them. He is a self-chosen representative and a volunteer champion. The Federal Constitution does not oblige the State to place its litigating and adjudicating processes at the disposal of such a representative, at least without imposing standards of responsibility, liability and accountability which it considers will protect the interests he elects himself to represent. It is not without significance that this Court has found it necessary long ago in the Equity Rules and now in the Federal Rules of Civil Procedure to impose procedural regulations of the class action not applicable to any other. We conclude that the state has plenary power over this type of litigation."

■ The plaintiffs contend that the Cohen case is not applicable because KRS 271.605 did not create any new rights or remedies. Clearly, however, it does make some significant changes in the rights of the parties. For example, if the alleged wrong to the Corporation were such as to be remediable by an action of law, the Corporation would be entitled to a jury trial which would not be available as a matter of right in a stockholder derivative action, such action being traditionally brought on the equity side of the Court. Moreover, the effect of requiring the action to be instituted in the name of the Corporation is to bring section 616 of the Kentucky Civil Code of Practice into effect. Under this provision, the Corporation would be required to give bond for costs as a condition of maintaining the action. The requirement of a cost bond was one of the very provisions which the Cohen case held to be substantive, for purposes of applying the rule of the Erie case.

■ The plaintiffs contend that the effect of applying KRS 271.605 to diversity actions in this Court would be to deprive this Court of jurisdiction over stockholder derivative actions involving Kentucky corporations. This is not strictly true, since it would still be possible to bring such actions in this Court against defendants residing outside Kentucky. For example, the present action could have been brought against the defendant Farris, who is alleged to be a citizen of Georgia. But be that as it may, there is no affirmative reason of law or policy for the Federal Courts to reach out and assume jurisdiction of stockholder derivative actions. As was said in the Cohen case, the internal relations between the management and stockholders of a corporation are peculiarly dependent upon the law of the State which has created the corporation; and so long as the State Courts are open there is no reason to assume that they will fail to do full justice. There is nothing to indicate that the Kentucky legislature, in enacting KRS 271.605, did so for the purpose of narrowing Federal jurisdiction. The presumption is, rather, that the statute embodies a considered judgment on the part of the lawmakers, that the rights of a corporation should be measured by the same standards, and be vindicated by the same procedures, whether such rights are asserted by the management of the corporation or by minority stockholders on its behalf. This policy should be respected by the Federal Courts.

The recent Federal cases evidence a distinct tendency to apply the rule of the Erie case wherever reasonably possible. For example, in Ragan v. Merchants Transfer & Warehouse Co., 337 U.S. 530, 69 S.Ct. 1233, 93 L.Ed. 1520, the Federal Courts were held

to be bound by a State rule in determining the date on which an action is deemed commenced, for Statute of Limitations purposes. In other contexts limitations questions are considered procedural; yet the Supreme Court held that, for purposes of applying the Erie rule, this issue should be regarded as a substantive one. See also Woods v. Interstate Realty Co., 337 U.S. 535, 69 S.Ct. 1235, 93 L.Ed. 1524. The dominant principle is that the rights of a party should not depend in any substantial way on whether the action is brought in a State or a Federal Court.

The plaintiffs rely on Smallen v. Louisville Fire & Marine Insurance Co., D.C. W.D.Ky., 1948, 80 F.Supp. 279. That case, however, was an action brought on behalf of a New York corporation to which KRS 271.605 did not apply.

■ There is a second reason why the motion to re-align should be granted. As will appear below, the amended complaint does not allege sufficient facts to sustain the contention that its directors and stockholders would necessarily have declined, upon demand, to bring legal action to enforce such claims as the Corporation may have had against the individual defendants. It follows that the special rule that a corporation will be re-aligned as a defendant in a stockholder derivative action, when its management is friendly to the defendant and hostile to the plaintiff, has no application; and under the general rule first established in Pacific R. R. Co. v. Ketchum, 1880, 101 U.S. 289, 25 L.Ed. 932 the Corporation should be aligned as a plaintiff because recovery is sought in its behalf. See also Koster v. (American) Lumbermen's Mutual Casualty Co., 330 U.S. 518, 522–523, 67 S.Ct. 828, 91 L.Ed. 1067.

*The Motion to Dismiss*

■ Considering the Corporation as a plaintiff, there is a lack of complete diversity of citizenship between the plaintiffs and the defendants, inasmuch as the Corporation and five of the individual defendants are alleged to be citizens of Kentucky. The motion to dismiss should therefore be granted because of lack of jurisdiction over the subject matter. City of Indianapolis v.

Chase National Bank, 314 U.S. 63, 69, 62 S. Ct. 15, 86 L.Ed. 47.

An additional reason for granting the motion to dismiss is that the plaintiffs have failed to exhaust their corporate remedies as required by Rule 23(b) of the Rules of Civil Procedure. As has been stated above, the plaintiffs have made no effort to induce the directors or stockholders of the Corporation to bring suit. Instead, they have endeavored to demonstrate that any efforts along this line would have been futile.

In appraising the sufficiency of the allegations on this point, the Court must take account of the fact that, for all that appears in the record, it would have been a very simple matter for the plaintiffs to make demand upon the directors and shareholders. This could have been done, for example, by simply mailing a copy of the complaint to the Board of Directors with a letter advising them that, unless the Corporation enforced its rights within a reasonable time, the plaintiffs would undertake to do so on its behalf. If the Board of Directors had failed or refused to take action, the plaintiffs could have appeared at the next annual meeting of stockholders, presented a copy of the complaint, and urged the election of directors who would cause the Corporation to bring suit. It would not even have been necessary for the plaintiffs to travel to Louisville for the stockholders meeting; a local proxy could have acted on their behalf.

■ It is well established that the courts will not take jurisdiction over intra-corporate disputes unless the ordinary corporate procedures are for some reason frustrated. As was said in Stone v. Holly Hill Fruit Products, Inc., 5 Cir., 56 F.2d 553, 554—"* * * A stockholder, in taking stock in the ordinary corporation, submits, within the charter limits, to a guidance of the corporate affairs according to the will of the owners of a majority of the stock and through the directors whom the majority choose. The minority have a right to have the majority exercise their judgment, and to exercise it honestly and not fraudulently, but have no right to have a court substitute their own ideas and wishes

for those of the majority, and that in advance of any refusal of the majority to hear and decide on the matter at issue. Minority stockholders may not in the absence of sudden emergency ask a court of equity to interfere in the management of their corporation until they have earnestly and unsuccessfully sought redress from the Board of Directors, and where appropriate also from the stockholders in meeting, unless they can show sufficient reasons for not doing so."

See also Dimpfel v. Ohio & Mississippi Ry. Co., 110 U.S. 209, 3 S.Ct. 573, 28 L. Ed. 121; Roush v. First National Bank & Trust Co., 310 Ky. 408, 220 S.W.2d 984, 987 and cases there cited. As was said by Judge Shackelford Miller, now of the Sixth Circuit Court of Appeals, in Greene County National Farm Loan Ass'n v. Federal Land Bank of Louisville, D.C., 57 F.Supp. 783, 790, affirmed 152 F.2d 215—"It is only in exceptional cases that the Court will interfere with the discretionary internal management of corporations. Corbus v. Alaska Treadwell Gold Mining Co., 187 U.S. 455, 463, 23 S.Ct. 157, 47 L.Ed. 256; United Copper Securities Co. v. Amalgamated Copper Co., 244 U.S. 261, 263 through 264, 37 S.Ct. 509, 61 L.Ed. 1119; Consolidated Cement Corp. v. Pratt, 10 Cir., 47 F.2d 90, 93. 'It is well established that the courts will not interfere with the discretion of a board of directors in exercising its legal powers by acting within the limits of its charter, and without fraud, actual or constructive, upon the stockholders, regardless of motives. Haldeman v. Haldeman, 176 Ky. 635, 197 S.W. 376.' Carter v. Louisville Railway Co., 238 Ky. 42, 47, 36 S.W.2d 836, 838, Venus Oil Corp. v. Gardner, 244 Ky. 176, 50 S.W.2d 537."

Turning now to the allegations of the amended complaint in the present case, this Court must decide whether such allegations demonstrate the futility of a demand on the Board of Directors and stockholders. In the opinion of this Court, they do not. The central question is whether the ownership of 40% of the voting stock of a corporation is, as a matter of law, so clearly equivalent to full power over the Board of Directors that the directors will obey the orders of the owners of said stock—even in contravention of their own duty to act for the best interest of the corporation and despite their own responsibility for failure to do so. This Court cannot bring itself to such a conclusion.

To be sure, there are conclusory allegations to the effect that the defendants Stout and Dulaney dominated and controlled the Board of Directors, and that by reason of the scattered holdings of the other stockholders the defendants Stout and Dulaney had effective power to elect a majority of the Board of Directors.

But the practical issue is whether the ends of justice and orderly procedure will be served better by enabling minority stockholders, through the use of such vague allegations, to impose on the defendants and the Court the necessity of a long and complicated trial which must result in dismissal if the Court finds that the defendants Stout and Dulaney did not in fact dominate and control the other directors and stockholders; or, on the other hand, whether those ends will be served better by adherence to a rule which would require the plaintiffs, before filing suit, to ascertain (by means of the simple procedures outlined above) whether the Corporation can be induced to bring the action. If the demand is made and the Corporation does bring the action, minority stockholders could be protected against the danger of ineffective prosecution of the action by intervention pursuant to leave of Court if a proper showing could be made. It seems quite obvious that, at least where the defendants own less than half of the voting stock and where they include only three directors on a board ordinarily composed of seven, it is preferable to require observance of the procedures contemplated by Rule 23(b).

It is not without significance that the original complaint was filed under a misunderstanding as to the membership of the Corporation's Board of Directors at that time. The original complaint alleged that the defendant Farris, as well as the defendants Stout, Rucker and Lyons, were members of the seven-man board; and it may be that, under such circumstances, a demand on the Board of Directors would have been

excused (although, even so, it would still have been necessary to make demand on the stockholders). The plaintiffs, in their brief, have explained that this misunderstanding was attributable to no fault of their own, and no objection has been raised to the filing of the amended complaint which withdraws the allegation that the defendant Farris was a director at the commencement of the action. However, this Court is bound to recognize that, at the time the action was commenced, the plaintiffs were laboring under a misapprehension on a highly material point, and it is reasonable to wonder whether they themselves would have initiated the action without demand on the directors if they had understood the facts correctly. Indeed, the plaintiffs in their brief claim to have been misled by a report of the Corporation to the New York Curb Exchange, dated August 27, 1948. Thus, it is clear that they were so indifferent to the possibility of obtaining action from the Board of Directors that they failed even to find out from the Corporation who was on the Board. As stockholders, they would certainly have been entitled to know who the directors were; and, if their primary concern was for the Corporation, they might well have been inclined to find out whether the membership of the Board had changed between August 27, 1948, and March 7, 1949, when the action was commenced.

It may be noted that, although it has not finally been decided, that Rule 23(b) should take precedence over a conflicting rule of State law, there is no such conflict in the present case. KRS 271.605, supra, embodies the same rule.

The plaintiffs rely on Delaware & Hudson Co. v. Albany & Susquehanna R. R. Co., 213 U.S. 435, 29 S.Ct. 540, 53 L.Ed. 862, where it was held that no demand on stockholders or directors was necessary. As the Supreme Court recognized in that case, the requirement of a demand on directors and stockholders "is intended to have practical operation, and to have that is must * * * be given such play as to fit the conditions of different cases." 213 U.S. 452, 29 S.Ct. 545. There the substantive question related to the rights of the Susquehanna Company under a contract with the Delaware Company. The Susquehanna Board consisted of twelve or thirteen directors (the opinion is not entirely clear) of whom six were also directors of the Delaware Company. Of the other six, one was a vice-president of Delaware, one was treasurer, one was a son of the president, and two were admittedly placed on the Susquehanna Board as nominees of the Delaware Company. In other words, a clear majority of the Susquehanna Board was comprised of persons having a fiduciary obligation to each of the two corporations. Under the circumstances, it was reasonable to assume that the Susquehanna Board was inherently incapable of exercising an unbiased judgment as to the rights of the two corporations under the contract. Being subject to conflicting duties, they were disqualified to act as directors of the Susquehanna Company in assessing its rights against the Delaware Company. In the present case, on the other hand, there is no allegation of any such conflict of duty on the part of the non-defendant directors. Their sole duty was to serve the interests of their corporation.

In the Delaware & Hudson case it was also held that demand on the stockholders was unnecessary. The Delaware Company owned about 25% of the stock of the Susquehanna Company, and the annual meeting of stockholders was not to be held until four months after the suit was filed. The Court held that, on the facts there presented, it could be assumed that a demand on the stockholders would have been futile. It does not follow that the same result should follow in the present case, where, for all that appears, the annual meeting of stockholders was imminent.

Incidentally, it is interesting to observe that the Delaware & Hudson case was apparently brought in the name of the Susquehanna Company as plaintiff—a procedure which is fully consistent with the present Kentucky rule, under KRS 271.605, supra.

In re Western Tool & Manufacturing Co., 6 Cir., 1944, 142 F.2d 404, reversed on other grounds sub nom. Price v. Gurney,

1945, 324 U.S. 100, 65 S.Ct. 513, 89 L.Ed. 776, is not in point. In that case a majority of the corporation's stock was held in a voting trust administered by three voting trustees who also constituted a majority of the Board of Directors. The same three men constituted a majority of a protective committee representing mortgage bondholders. The purpose of the action was to prevent foreclosure of the mortgage for the benefit of the bondholders. The Court rightly held that the three voting trustees, who were subject to conflicting duties as directors and as members of the protective committee, were disqualified to represent the corporation in opposing the foreclosure, and that a demand on them was presumptively futile.

 There is still a third reason why the motion to dismiss should be granted. The duties of the individual defendants as directors of the Corporation must be determined according to Kentucky law. Beard v. Achenbach Memorial Hospital Ass'n, 10 Cir., 1948, 170 F.2d 859. Under Kentucky law, however, directors are not liable to their corporation for mismangement unless they are guilty of actual or constructive fraud. They are held very strictly to account if they allow themselves to be placed in a position of conflict between their fiduciary duty to their corporation and their own private interests. But where the charge is not that they have been unfaithful to their trust but only that they have made errors of business judgment, another rule prevails. It is held, in effect, that although the stockholders do not assume the risk that directors will be disloyal, they do assume the risk that directors will make mistakes. Dudley v. Kentucky High School, 9 Bush 576, 72 Ky. 576; Savings Bank of Louisville's Assignee v. Caperton, 87 Ky. 306, 8 S.W. 885; Venus Oil Corporation v. Gardner, 244 Ky. 176, 50 S.W.2d 537, 538. In the Dudley case, the Court said—"* * * Each and every stockholder contracts that the will of the majority shall govern in all matters coming within the limits of the act of incorporation; and in cases involving no breach of trust, but only error or mistake of judgment

upon the part of the directors who represent the company, individual stockholders have no right to appeal to the courts to dictate the line or policy to be pursued by the corporation."

In the Venus case, the Court said—

"* * * Before stating the facts, it may be well, first, to consider the applicable law in cases of this kind. The court may not intervene or interfere in the internal affairs of a corporation at the instance of minority stockholders unless its governing authorities have acted or are threatening to act fraudulently, in the broad sense, against them or have abused the implied trust imposed in officers and directors in such manner or to such extent as to warrant the interposition of equity. Huffaker v. Krieger's Assignee, 107 Ky. 200, 53 S.W. 288, 21 Ky.Law Rep. 887, 46 L.R.A. 384; Manufacturers' Land & Improvement Co. v. Cleary, 121 Ky. 403, 89 S.W. 248, 28 Ky. Law.Rep. 359; Poutch v. National Foundry & Machine Co., 147 Ky. 242, 143 S.W. 1003, 1004; Beha v. Martin, 161 Ky. 838, 171 S.W. 393; Haldeman v. Haldeman, 176 Ky. 635, 197 S.W. 376; Carter v. Louisville Railway Co., 238 Ky. 42, 36 S.W.2d 836.

"Of special pertinency is the following quotation from the Poutch case: 'It is true the directors hold a position of trust. It is their duty to manage the business of the corporation honestly and with fidelity. As they occupy a position of trust when they vote a salary to one another, they cannot keep the money if they act to the prejudice of the corporation. * * * The general rule is that the action of the directors must be a fraud on the corporation, actually or constructively, before the directors can be held liable.' "

There are a few cases in which the directors of financial institutions have been held to a somewhat stricter standard of performance than have the directors of ordinary business corporations. It seems that bank directors may be held liable not only for actual or constructive fraud on their corporation, but also for losses resulting from their lack of attention to its affairs. See for example, Cunningham v.

Shellman, 1915, 164 Ky. 584, 175 S.W. 1045. This rule was recognized in Atherton v. Anderson, 6 Cir., 1938, 99 F.2d 883, where bank directors were held liable for losses resulting in their inattention to duty, though not for losses which resulted from affirmative decisions which proved to be unwise. Since, in the present case, the individual defendants are not charged with lack of attention to the affairs of the Corporation, this line of cases has no application.

Let us now review the charges against the individual defendants, to see whether they include charges of actual or constructive fraud. They are nowhere charged with actual fraud, in the sense of a deliberate and intentional injury to the Corporation for their own benefit. Do any of the charges against them amount to accusations of constructive fraud?

■■■ "Constructive fraud", as the term is used in the Kentucky decisions, refers to acts which may have been done in good faith and with no purpose to harm the corporation, but which were done by a person who has allowed himself to be placed in a position of conflict between a fiduciary obligation and his own private interests (or, perhaps, some other fiduciary obligation). In this situation, by reason of the strict rule applicable to fiduciaries, the courts will examine carefully into the results of the act and will hold the fiduciary liable if, despite his good intentions, his act resulted in injury to the subject-matter of his trust.

■■■ The allegations of the amended complaint do not make out a case of constructive fraud. The various charges of "culpable negligence", "reckless disregard" of the welfare of the Corporation, "incompetence", and "waste" do not imply that the individual defendants had placed themselves in a position of conflict. Only in two connections does the amended complaint suggest that the individual defendants were subject to any motivation other than their duty to the Corporation. These two charges must now be examined.

The first such charge is that, in obtaining new capital through the medium of a pre-ferred stock issue and a mortgage loan, the individual defendants were motivated by their desire to pay off corporate obligations which they had themselves personally guaranteed. It is a fair inference that the said guaranties had been made as a matter of accommodation to the Corporation. It can also be fairly assumed that, if the individual defendants had been required to make good on the guaranties by reason of the Corporation's default, they would have succeeded to the position of the Corporation creditors by virtue of their rights of subrogation as sureties or guarantors, so that the debts of the Corporation would have been the same as before. There is no allegation that the preferred stock and mortgage financing was any less advantageous than the prior loans which they replaced. Thus, the amended complaint fails to allege that the Corporation suffered in any way by virtue of the refinancing.

To be sure, it is alleged that the refinancing was made necessary by the depletion of assets which resulted from the several projects referred to. This, however, has no bearing on the question whether the refinancing itself resulted in loss to the Corporation; and it is only the refinancing, not the earlier projects, which is alleged to have been motivated by the desire to relieve the individual defendants of personal liability as endorsers of the Corporation's obligations.

The second particular in which the defendants are charged with having pursued selfish interests at the expense of the Corporation relates to the retention of the defendant Dulaney as president of the Corporation despite his allegedly demonstrated incompetence. The claim is that the defendant Stout insisted on keeping Dulaney in office as president because of the relationship between them, and that the other individual defendants obeyed Stout's wishes because of their selfish interest in retaining their positions as officers and directors of the Corporation.

It is not at all clear that a prima facie case of incompetent management can be made simply on the basis of a showing that the Corporation has operated unsuccess-

fully for a period of three years. At the very least, it would seem to be necessary to show that other corporations in the same or a comparable industry had been able, during the same period, to operate at a profit. It is hardly conceivable that a Board of Directors must discharge the president of the corporation whenever the corporation has failed to operate profitably for one or two or three years. Particularly is this true where the corporation has been recently organized. It is easy to envisage a situation where such a rule might lead the directors to inflict serious harm on their corporation by discharging the ablest man available for the position of president.

Assuming, however, that it may be possible to make out a prima facie case merely by alleging continued unprofitable operations, it must surely be necessary to allege at least that the operations of the Corporation, viewed as a whole, were in fact unprofitable. The amended complaint in the present case does not do this. It seizes upon four specific ventures which, it is alleged, turned out unprofitably, but for all that appears in the amended complaint, the Corporation may well have operated at an over-all profit and the directors may have had good reason to be satisfied with the performance of the defendant Dulaney as president. The fact that new financing was necessary did not in itself indicate that the Corporation was losing money; the proceeds of the preferred stock issue and mortgage financing amounted to considerably less than the amounts which the complaint alleges to have been invested in new and expanded plant facilities.

In the absence of any factual allegations sufficient to lay a basis for a conclusory charge of managerial incompetence, there is no significance in the allegations that the defendant Stout was motivated by affection for his son-in-law and that other individual defendants were led to obey Stout's wishes by reason of their concern for their own salaries. Even if these motivations did exist, there is no sufficient allegation that they resulted in harm to the Corporation.

As a concluding comment on this branch of the case, it is appropriate to observe that, from the allegations of the amended complaint itself, it can clearly be seen that the individual defendants themselves—and particularly Stout and Dulaney, who held large stock interests in the Corporation—had a major financial stake in the welfare of the Corporation. Only if the Corporation operated profitably, could they expect to continue receiving salaries and dividends. The fact that they were willing to assume personal liability for the debts of the Corporation indicates the extent to which they identified their own interests with its welfare. Under the circumstances, the Court may be permitted to entertain with some skepticism the allegation that the defendant Stout was willing to run the Corporation into the ground rather than hurt the feelings of his son-in-law.

### The Motion to Strike

The individual defendants have moved to strike the allegations of the complaint relating to the plywood barrel project and the purchase of stock in Veneer Products, Inc., on the ground that the allegedly wrongful acts involved in these transactions are not claimed to have been committed subsequent to September 24, 1946, the earliest date on which any of the plaintiffs acquired stock in the Corporation. The motion is based on Rule 23(b) of the Rules of Civil Procedure and on KRS 271.605, both of which provide that the plaintiff must allege that he owned stock at the time of the transaction of which he complains. The plaintiffs oppose the motion on the grounds that the plywood barrel project is alleged to have continued throughout the year 1947, and that the Veneer Products transaction involved a five-year purchase contract.

They also contend that the alleged unprofitability of these two transactions has a bearing on the question of the defendant Dulaney's competence as president.

The fact that the plywood barrel project continued throughout 1947 is immaterial. The question is whether the plaintiffs owned stock at the time of the "transactions complained of". Assuming that the individual defendants did wrong to the Cor-

poration by embarking upon the plywood barrel project, it does not follow that they committed any error of judgment in carrying it forward after the contracts with distilling companies had been made and after the initial expense of development work and plant expansion had been incurred. It is likewise immaterial that the Veneer Products contract covered a five-year period. Assuming that the individual defendants did .wrong to the Corporation by entering into the contract, it does not follow that they committed any wrong in carrying out the contract once it had been made. Indeed, had they not done so, the Corporation would presumbly have been subject to liability for breach of contract.

■ As for the relevance of the plywood barrel project and the Venner Products transaction to the question of the competence of the defendant Dulaney, there is no occasion for a ruling at the present time. If the amended complaint contained sufficient allegations to support a claim that Dulaney was clearly incompetent (which, as stated above, it does not) it would be possible for the plaintiffs to sustain the allegation by any proof relevant to that issue. And it may well be that such proof would be admissible even though it involved acts done prior to the acquisition of stock by the plaintiffs. It is quite another thing, however, to base substantive charges on the plywood barrel project and the Veneer Products transaction. If these charges were allowed to remain in the pleadings the individual defendants would be called upon to meet unnecessarily broad issues and the scope of the case would be unduly extended. For example, if these substantive charges were retained it would be necessary to explore in wearisome detail the exact extent of the resulting loss to the Corporation, whereas the only material inquiry is whether the two transactions were handled in such a way as to demonstrate the incompetence of the defendant Dulaney.

In support of the foregoing views, see Pergament v. Frazer, D.C.E.D.Mich. 1949, 93 F.Supp. 9; Newkirk v. W. J. Rainey, Inc., Del.Ch. 1950, 76 A.2d 121.

The motion to strike paragraphs 14 and 15 of the complaint should therefore be granted.

The individual defendants have moved to strike those portions of the complaint relating to the Costa Rican timber project, the toilet seat project, and the plant expansion program, on the ground that they fail to set forth the particular acts of mismanagement of which complaint is made. They point out, although the amended complaint describes the several transactions in considerable detail, it does not say just what the individual defendants did that they should not have done, or what they failed to do that they should have done.

■ It is impossible, of course, to state any definite rule as to the degree of particularity necessary for pleading purposes. Judgment in each case must be the resultant of two countervailing considerations. On one hand, the plaintiff must not be subjected to requirements so strict as to preclude the practical possibility of relief in a just case. On the other hand, the defendants should not be put to the trouble and expense of a trial unless the plaintiff has alleged enough to make it appear likely that a legal wrong has been committed. The latter consideration may, perhaps, be given somewhat greater weight in a case where the trial will be long and complicated and where the evidence at the trial may be such as to harm the Corporation by publicizing facts which may be useful to its competitors and damaging to its credit.

The application of the foregoing considerations is illustrated by Winberg v. Camp Taylor Development Co., Inc., 264 Ky. 612, 95 S.W.2d 261; Smith v. Chase & Baker Piano Mfg. Co., D.C.E.D.Mich., 197 F. 466, 470; and Craftsman Finance & Mortgage Co., Inc., v. Brown, D.C.S.D.N.Y., 64 F. Supp. 168. In the Winberg case, the Kentucky Court of Appeals, 95 S.W.2d at page 263 said—

"Plaintiff asked that the cause be referred to the commissioner of the court, and that the commissioner be directed to ascertain certain facts and report his finding to the court. The facts which he asked the commissioner to ascertain and report to

the court are those which are necessary to be alleged to state a cause of action. Apparently plaintiff recognized the fact that he was not possessed of necessary facts to enable him to state a cause of action, and asked the court, through its commissioner, to ascertain such facts for him. We know of no authority for such procedure. * *

"From a reading of the petition it is at once apparent that it consists of a series of conclusions and opinions of the pleader without supporting facts. While a demurrer admits facts properly pleaded, it does not admit conclusions of law or mere conclusion or opinions of the pleader.

"The law presumes honesty and fair dealings between men, and when a recovery is sought upon an allegation of fraud or other unlawful act, the pleading must set out definitely what constitutes the alleged fraud or delinquency in duty in order that the defendant may have notice what he has to defend, and a mere allegation of fraud or other wrongful act without supporting facts is insufficient."

And in the Smith case, the Court said, 197 F. at page 471—"* * * Losses resulting from ignorant or even foolish mismanagement cannot be recovered. A bill founded upon fraud or misconduct which does not allege with certainty and definiteness tangible facts to sustain its general averments of such fraud and misconduct is insufficient, and cannot be sustained. Van Weel v. Winston, 115 U.S. 228, 237, 238, 6 S.Ct. 22, 29 L.Ed. 384; * * *."

■ Application of these considerations in the present case leads to the conclusion that the amended complaint does not sufficiently specify the respects in which the individual defendants breached their duty to the Corporation in undertaking the Costa Rican timber project, the plywood toilet seat project and the plant expansion program. The motion to strike paragraphs 16, 17 and 18 of the amended complaint should therefore be granted.

Finally, the individual defendants have moved to strike the allegations of the amended complaint relating to the Veneer Products transaction, the preferred stock and mortgage financing, the employment contracts and the utilization of idle plant facilities for manufacture of furniture and prefabricated houses. The basis of the motion is that the allegations concerning these transactions are consistent with the possibility that the transactions resulted in profit rather than loss to the Corporation.

The motion to strike the allegations concerning the Veneer Products transaction has already been granted on other grounds, and it need not be considered here.

The plaintiffs virtually concede, in their brief, that the other allegations are not intended to charge substantive breaches of duty, but merely to show the results of the alleged mismanagement "and afford a possible basis for assessing damage." The plaintiffs urge that the allegations and questions should be allowed to remain in the amended complaint because the individual defendants "do not show how they can in any way be harmed" by them.

As has already been pointed out in another connection, however, the scope of the proof may be broadened very considerably if allegations are allowed to remain in the complaint as substantive charges when in fact they are relevant only in connection with other substantive charges and do not in themselves constitute a basis of liability.

■ If, as the plaintiffs seem to concede, the only significance of these allegations lies in their bearing on the extent of damages resulting from other acts of alleged mismanagement, they should be stricken. There is no reason why the Court should be burdened with proof as to the propriety of the preferred stock and mortgage financing, the employment contracts, and the use of idle plant facilities, if the only material inquiry is whether they evidenced loss to the Corporation and, if so, how much the loss amounted to. The motion to strike pargaraphs 19, 21, and 22 and the fourth sentence of paragraph 18, should therefore be granted.

For the foregoing reasons, the motion to re-align, the motion to dismiss and the motion to strike are granted. An order dismissing the amended complaint will be entered.